934 F.2d 743
 59 USLW 2752
 Jane DOE, Plaintiff-Appellee,
v.
George D. SMALL, Mayor of the City of Ottawa, Illinois;
Barbara J. Lindquist, William C. Ferguson, Alan R. Howarter
and William N. Stevenson, Members of the City Council of the
City of Ottawa, Illinois; and the City of Ottawa, Illinois,
a municipal corporation, Defendants,[1]
The Ottawa Jaycees, Intervenor-Defendant-Appellant.
 No. 89-3756.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 7, 1990.
Decided May 28, 1991.
Rehearing En Banc Granted and Opinion Vacated.
 
 Coffey, Circuit Judge, filed a dissenting opinion.
 Joseph R. Lundy, Deborah A. Golden, Schiff, Hardin & Waite, Harvey M. Grossman, Jane M. Whicher, Roger Baldwin Foundation, Chicago, Ill., Donald S. Rothschild, Rothschild & Associates, Oak Park, Ill., Elmer Gertz, Chicago, Ill., for plaintiff.
 D.J. Sartorio, Mitchell A. Orpett, Michael J. Meyer, Tribler & Orpett, Chicago, Ill., for defendants.
 Cynthia Photos Abbott, Joel G. Chefitz, Patrick J. Lamb, Katten, Muchin & Zavis, Chicago, Ill., George C. Hupp, Jr., Hupp, Lanuti, Irion & Martin, Ottawa, Ill., Robert K. Skolrood, Nat. Legal Foundation, Virginia Beach, Va., for defendant-appellant.
 Judson H. Miner, Davis, Miner, Barnhill & Galland, Sylvia Neil, Chicago, Ill., for amicus curiae American Jewish Congress.
 James D. Holzhauer, Robert A. Helman, Thomas C. Berg, Mayer, Brown & Platt, Chicago, Ill., Jeffrey P. Sinesky, Steven M. Freeman, Jill L. Kahn, Richard E. Shevitz, Michael A. Sandberg, Anti-Defamation League of B'nai B'rith, New York City, for amicus curiae Anti-Defamation League of B'nai B'rith.
 Before CUMMINGS and COFFEY, Circuit Judges, and GORDON, Senior District Judge.[2]
 CUMMINGS, Circuit Judge.
 
 
 1
 The Ottawa Jaycees ("Jaycees") appeal from the district court's final judgment prohibiting them and the defendant City of Ottawa, Illinois, from mounting in a public park their annual yuletide display of sixteen large paintings depicting various events in the life of Jesus Christ. 726 F.Supp. 713. Finding an absence of any issue of material fact, Celotex Corp. v. Catrett, 477 U.S. 317, 322-323, 106 S.Ct. 2548, 2552-2553, 91 L.Ed.2d 265 (1986), the district court entered summary judgment in favor of plaintiff Jane Doe. The Jaycees, who were the intervenor-defendant in the original action, then sought relief from this Court, claiming that the display of paintings did not represent governmental endorsement of religion in violation of the Establishment Clause of the First Amendment.[3] In addition, they asserted an infringement of their own constitutionally protected right of freedom of expression under the First Amendment.
 
 
 2
 We disagree with the Jaycees. The City encouraged, authorized and endorsed the Jaycees' display of these paintings in a public park, thus offending the core of the Establishment Clause's essential prohibition of state endorsement of religion. Because the City wished to promote the religious message of the paintings by permitting their annual display in Washington Park, we affirm the judgment below.
 
 I. BACKGROUND
 
 3
 Before relating the specific facts concerning the Jaycees' display, we must establish the proper scope and perspective of our review of a grant of summary judgment. This Court's review is, of course, de novo, meaning that we look at the record in the case anew from the same standpoint as the trial judge. On review of an entry of summary judgment, we must determine that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In conducting this inquiry to determine whether material facts are at issue, "we must review the record and all inferences therefrom in the light most favorable to the party opposing the motion." Local 1545, United Mine Workers v. Inland Steel Coal Co., 876 F.2d 1288, 1292 (7th Cir.1989), citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).
 
 A. Facts
 
 4
 The story of the display of the sixteen large paintings depicting major events in the life of Jesus Christ began in 1956. The Ottawa Retail Merchants' Association, offended by the commercialism overtaking the Christmas holiday, endeavored to "put Christ back into Christmas." The Association's method of choice was to commission sixteen large paintings of Jesus' life for display in Washington Park ("Park"), a city park located on the edge of Ottawa's business district near the center of town. A typical small-town park, the Park occupies an open city block, covered with grass and a few trees. The Park has provided the location for numerous one-time events, including a campaign appearance by George Bush during the 1988 Presidential campaign, and other activities, ranging from a concert for world peace to an all-church concert and a concert for veterans of the Vietnam War. The City has records of activities taking place in the Park from June 1982-September 1988. (Affidavit of Charles Singer, Ottawa City Clerk, Defendant's Exhibit No. 3.) Aside from these one-time events, the only events which appear to have occurred annually in the Park for any extended period of time are a flea market and the display of paintings at issue in this case.
 
 
 5
 In most years since 1956, during the Christmas season in Ottawa, a passer-by traveling on LaSalle Street along the western edge of the Park would see the following: 16 paintings, each measuring 8 feet 8 inches in height, displayed in two lines that form a "V" spanning most of the Park's west side. No matter whether it was day or night, the paintings were clearly visible at all times, being illuminated at night by street lights.
 
 
 6
 The paintings together tell the story of the life, crucifixion and resurrection of Jesus Christ, as told in the four gospels of the New Testament, the Books of Matthew, Mark, Luke and John.[4] The scene depicted in each painting can be traced to at least one of these books, which together comprise the central teachings of Christianity. Only three of the 16 paintings relate specifically to the religious holiday of Christmas, celebrating Jesus' birth. These canvases depict the infant Jesus in the manger (Luke 2:7), the announcement of the birth of Jesus being received by the shepherds in the field (Luke 2:8-20), and the three wise men traveling to Bethlehem, the birthplace of Jesus (Matthew 2:1-12). This and the description of the other paintings' content is based primarily upon the Declaration of Graydon F. Snyder, Dean of Chicago Theological Seminary and Professor of New Testament, filed in support of plaintiff's motion for summary judgment (Plaintiff's App. 18). The Jaycees do not dispute the content of the paintings, except to claim that all of the paintings relate to Christmas, because the birth of Jesus is inseparable from the rest of his life.
 
 
 7
 The remaining thirteen paintings chronicle subsequent events of significance in Jesus' life. In chronological order, painting number four illustrates the flight of Mary, Joseph and the baby Jesus into Egypt (Matthew 2:13-15). In the fifth painting, Jesus is baptized by John the Baptist. Painting number six shows Jesus calling two of his disciples, the "fishers of men." (Matthew 4:18-22; Mark 1:16-20; Luke 5:1-11; and John 1:35-42.)
 
 
 8
 The seventh painting recalls the "stilling of the storm," in which Jesus and his disciples were in a boat on the lake near Gennesaret in Galilee and a great storm arose. Afraid, the disciples questioned their safety, but Jesus calmed the winds and stilled the storm. (Matthew 8:18, 23-27; Mark 4:37-41; and Luke 8:22-25.)
 
 
 9
 In the eighth picture, Jesus performs the miracle of the loaves and fishes. The painting recounts the incident where Jesus fed 5,000 people with only five loaves and two fishes. (Matthew 14:13-21; Mark 6:30-44; Luke 9:10-17; and John 6:1-13.)
 
 
 10
 The ninth picture in the display shows Jesus teaching. The picture contains elements of both the Sermon on the Mount (found in Matthew 5:1-7:29) and the story of Jesus teaching young children. The Sermon on the Mount sets forth what are known as the "Beatitudes," such as: "Blessed are the meek; for they shall inherit the earth." (Matthew 5:5.) The other part of the painting portrays Jesus teaching several small children. In the tenth picture, the stone covering the empty tomb of Lazarus is rolled away, after Jesus recalled Lazarus, a close friend of Jesus, from the dead. (John 11:38-44.)
 
 
 11
 Jesus enters Jerusalem on what has now become known as Palm Sunday in the eleventh picture. (Matthew 21:1-9; Mark 11:1-10; and Luke 19:28-38.) Palm Sunday falls one week before Easter Sunday and is an important date in the "Passion Narrative," the story of Jesus' death. The next event in the crucifixion story, illustrated in the twelfth painting, is the Last Supper. (Matthew 26:17-29; Mark 14:12-25; Luke 22:7-20; and 1 Corinthians 11:23-27.) At the Last Supper, Jesus celebrated Passover, the Jewish holiday commemorating the flight of the Jews from Egypt under the leadership of Moses.
 
 
 12
 The display's thirteenth canvas depicts Jesus praying in the Garden of Gethsemane. (Matthew 26:36-46; Mark 14:32-42; and Luke 22:40-46.) Just before his crucifixion, Jesus went to the Garden to contemplate his impending crucifixion and to pray to God. Next, in the fourteenth painting, the Romans try Jesus, accusing him falsely of heresy and treason. (Matthew 27:11-26; Mark 15:1-15; Luke 23:2-25; and John 18:28-19:16.)
 
 
 13
 The fifteenth scene depicts Jesus' crucifixion. (Matthew 27:27-54; Mark 15:16-41; Luke 23:11-49; and John 19:16-37.) This scene shows Jesus' death, before he rose from the dead on Easter morning. Finally, the sixteenth painting illustrates a scene that takes place after Jesus' resurrection, the "Emmaus Story." (Luke 24:13-35.) In this scene, the resurrected Jesus is recognized by two of his followers, despondent over his death. Jesus explains to them that he, the Messiah, had to suffer, die and be raised again.
 
 
 14
 To sum up, out of the sixteen paintings in the display, only three have anything to do with Christmas, while the final seven tell the story of Jesus' death and resurrection, commemorated by Christians during Lent and on Easter. The middle six paintings depict other important events and miracles in the life of Jesus, none of which relates specifically to either Christmas, Lent or Easter.
 
 
 15
 These paintings were first erected and displayed in 1956, and taken down and stored by the City of Ottawa during every Christmas season through 1969. During the 1970s, newspaper accounts indicate that the City refrained from showing the paintings due to public criticism of the display.
 
 
 16
 In 1980, an Ottawa newspaper reported that a City official had discovered the paintings in a municipal storage area. The newspaper article quoted the Mayor of Ottawa at the time as saying he hoped to find a private group willing to display the paintings and promising further that "the City will pay the electrical bills for illuminating the paintings and help in any way we can, except financially, if a group wants to display them again."[5] (Ottawa Daily Times, Nov. 21, 1980, Plaintiff's Exhibit No. 28.)[6] That same month the Ottawa Jaycees requested and received permission from the City to become the official "caretakers" of the paintings. By their own account the Jaycees hoped that the display would "enhance the Christmas spirit in the community of Ottawa" and would reveal "[the] true meaning of Christmas * * * thereby promoting faith in God." (Ottawa Jaycees' Chairman's Planning Guide, Plaintiff's Exhibit No. 44.) The City assisted in the reintroduction of the display by providing some of the labor necessary to erect the paintings again in the Park.
 
 
 17
 When the paintings were redisplayed in the Park, they remained on display for varying periods of time. According to the defendants' approximations, from 1980 to 1988, the periods of display were as follows:
 
 
 18
 Year Erected (Approximate Dismantled (Approximate Date)
 Date)
-------------------------------------------------------------------------------
1988 November 27, 1988 No later than January 1, 1989
1987 November 29, 1987 January 24 to 30, 1988
1986 November 15, 1986 Commenced January 1987 (removed five
 Paintings in January 1987 but
 remaining Paintings frozen);
 completed removal of remaining
 Paintings February 21, 1987
1985 December 1, 1985 February 2, 1986
1984 December 2, 1984 February 10, 1985
1983 December 3, 1983 March 4, 1984
1982 December 4, 1982 January 19 or 21, 1983
1981 December 5, 1981 January 10, 1982
1980 December 8, 1980 January 14, 1981
(R. 108, Exhibit 8 at 5.)[7]
---------------

7 Plaintiff disputes the Jaycees' approximations, arguing that the defendant
based its approximation on information and belief, making this chronology
improperr evidence in support of defendant's motion for summary judgment.
Plaintifff claims that the paintings were on display for an average of 11
weeks each year. (Plaintiff's Br. at 4 n. 3.)
----------
 
 
 19
 The City's involvement with the display did not cease in 1980. In 1986, Richard Rohrer, then a resident and taxpayer of Ottawa and the initial plaintiff in this suit, protested the display of the paintings, stating that he found the display extremely offensive. He claimed also that the presence of the display had deprived him of the use and enjoyment of the Park.[8] In response to his complaint, the City Council reviewed the history of the display, calling it "The Greatest Story Ever Told," and acknowledging that it portrays the central story of Christianity. (City Council Resolution, Dec. 2, 1986, Plaintiff's App. 33.) Furthermore, the Council made a specific finding that the paintings "are an integral part of the seasonal decorations epitomizing Christmas" displayed in Washington Park and other locations in Ottawa and resolved:
 
 
 20
 After due consideration and reflection upon the complaint raised concerning the pictures in Washington Park, that this Council endorse the activities of the Ottawa Jaycees in maintaining, erecting, dismantling and storing said pictures and incorporating them in the overall Christmas display that annually graces the downtown area of the City.
 
 
 21
 Id. (emphasis supplied). At the same meeting the Council also granted the Jaycees permission to erect permanent structural support for the paintings in the form of thirty-two, concrete-filled holes, each containing a metal sleeve to support one side of each painting.
 
 
 22
 After passing the Resolution, the City granted its approval of permanent foundations for the paintings, and the City Engineer and City Commissioner of Public Improvement discussed the precise placement and details of the holes containing the metal sleeves, each measuring 30 inches in length, with representatives of the Jaycees at a meeting in the Park. The Jaycees altered the display by replacing the former municipal holes for the paintings in order to widen the angle of the "V" so that "passing cars can see the paintings sooner as they are coming down the road." The foundations to date have served no other purpose than to provide structural support for "The Greatest Story Ever Told," although it is the Jaycees' contention that other displays, even one advocating Satanic worship, may freely be mounted on the same foundations. (Deposition of George D. Small, Mayor of Ottawa, Defendant's Exhibit No. 9 at 86.) When the paintings are not on display, the holes and sleeves remain covered.
 
 
 23
 The 1986 decision by the Council to continue permitting the display did not end the controversy. Rohrer filed suit on August 1, 1988. Initially upon receipt of the suit, Mayor Small reiterated the City's position in support of the display: " 'As far as we (the City) know, we are going to proceed and put the pictures back in the park.' " (Suit filed over park paintings, Ottawa Daily Times, Aug. 16, 1988, Plaintiff's Exhibit No. 53.) In the same article, the Mayor commented further on Rohrer's suit:
 
 
 24
 'This is what I guess happens in a free country. If he doesn't like the paintings, then he can drive around them. * * * Maybe he's looking for a public reaction, but I don't want him crying when the public puts the heat on him.'
 
 
 25
 Id. Finally, Mayor Small called for a public response so that the City could decide whether to spend tax dollars to defend the suit. He suggested that the City might initiate a fund drive to raise money "to keep the paintings in the park." Id. However, several months later, on the advice of the City Attorney, John Hayner, the City changed its position. When the Jaycees' request to display the paintings was presented to the Council at its October 18 meeting, the following occurred:
 
 
 26
 Mayor Small presented request for erection of paintings in Washington Park.
 
 
 27
 Moved by Mayor Small that this Council deny permission for the erection of the 16 paintings of the life of Christ in Washington Park during the Christmas season of 1989.
 
 Ayes:
 
 28
 Nays: None. Motion carried.
 
 
 29
 Jim Bruehler, President of the Ottawa Area Chamber of Commerce, presented costs and specifications for a "Festival of Lights" in Washington Park as an alternative.
 
 
 30
 (Minutes of Regular meeting of City Council, Oct. 18, 1988, Plaintiff's Exhibit No. 54.) After the Council's vote preventing the Jaycees from displaying the paintings, private businesses offered to have the paintings displayed on their property. The Jaycees tentatively concluded an agreement with the First National Bank of Ottawa, located across from City Hall. The Ottawa Daily Times quoted Mayor Small's reaction to the proposed new home for the paintings: "It's an honor to have the pictures across the street from City Hall. * * * Maybe some day they'll be back in Washington Park where they belong." (Paintings Get Home, Ottawa Daily Times, Oct. 21, 1988, Plaintiff's Exhibit No. 55.)
 
 
 31
 When it appeared that the City decided not to fight Rohrer's suit, the Council convened a special meeting on Oct. 28, 1988, "for the purpose of discussing the erection of the Life of Christ paintings in Washington Park lawsuit." (Minutes of Special Meeting, Oct. 28, 1988, Plaintiff's Exhibit No. 56.) According to the Council minutes, the following series of events transpired:
 
 
 32
 George Hupp, Jr. appeared and introduced Mr. Robert Skolrood National Legal Foundations [sic] representative concerning the defense of the lawsuit.Robert Skolrood discussed the excellent fact pattern involving religious displays on public streets and parks applying to the defense of the lawsuit. He stated his organization will commit $100,000.00 to this case and will file an intervening petition on behalf of the Jaycees if the City continues the defense of the lawsuit.
 
 
 33
 Mayor Small presented motion to recess into executive session. * * *
 
 
 34
 Council recessed at 8:15 A.M.
 
 
 35
 Council reconvened at 8:29 A.M.
 
 
 36
 City Attorney John Hayner reiterated his recommendation to the Council from prior meetings stating finances, no reasonable chance of winning and alternate sights [sic ] were the major factors in his recommendation.
 
 
 37
 * * * * * *
 
 
 38
 Moved by Mayor Small that the motion of October 18, 1988 prohibiting the Ottawa Jaycees from erecting the 16 paintings of the life of Christ in Washington Park for the 1988-1989 Christmas Season be and hereby is rescinded.
 
 
 39
 * * * * * *
 
 Ayes:
 
 40
 Nays: None: Motion carried.
 
 
 41
 Id.
 
 
 42
 That same season, after deciding to permit the Jaycees to display the paintings, the City affixed decorations in the vicinity of the paintings and throughout the town. The City installed a 15-foot tall lighted snowman in the Park and "trimmed
 
 
 43
 the town" by stringing lights, bows,
 
 
 44
 snowflakes and giant candles on the trees in the Park and around town. The City dubbed this latter seasonal display "The Festival of Lights." The giant snowman sometimes has company, for the City also added a Santa Claus House, which apparently alternates between the Park and the firehouse.
 
 
 45
 The City posted no disclaimer of its own next to the paintings. However, the Jaycees installed a small sign next to the display. Measuring only 20 1/2 inches by 21 1/4 inches, the sign read, in lettering 1- 1/16 inches high: "THIS DISPLAY HAS BEEN ERECTED AND MAINTAINED SOLELY BY THE OTTAWA JAYCEES, A PRIVATE ORGANIZATION, WITHOUT THE USE OF PUBLIC FUNDS." The sign can be seen but not read from LaSalle Street, the street abutting the Park on the side where the paintings are displayed.
 
 
 46
 In our above review of the facts, we have drawn all reasonable inferences in a light most favorable to the non-moving party to determine whether there is any genuine issue of material fact requiring further fact-finding. The existence of disputed facts does not prevent this Court from entering summary judgment in favor of the plaintiff. This Court recognizes that contested factual issues such as the duration of the display divide the parties. However, as we have stated before: "The existence of a factual dispute does not necessarily preclude summary judgment unless 'the disputed fact is outcome determinative under the governing law.' " Korf v. Ball State Univ., 726 F.2d 1222 (7th Cir.1984), citing Egger v. Phillips, 710 F.2d 292, 296 (7th Cir.1983), certiorari denied, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262. The point is simply that summary judgment provides courts with a means of resolving litigation without trial when there are no genuine factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' "); Samuels v. Wilder, 871 F.2d 1346, 1349 (7th Cir.1989) ("Merely alleging a factual dispute cannot defeat the summary judgment motion."); Beard v. Whitley County REMC, 840 F.2d 405 (7th Cir.1988) ("The court should neither 'look the other way' to ignore genuine issues of material fact, nor 'strain to find material fact issues where there are none.' "), quoting Secretary of Labor, United States Dep't of Labor v. Lauritzen, 835 F.2d 1529, 1534 (7th Cir.1987) ("[A] minor factual dispute does not preclude summary judgment."), certiorari denied, Lauritzen v. McLaughlin, 488 U.S. 898, 109 S.Ct. 243, 102 L.Ed.2d 232 (1988).
 
 
 47
 In this case the factual issues contested by the parties do not rise to the level of genuine material issues precluding the entry of summary judgment in this case. This Court has recognized repeatedly that disputes over the constitutionality of religious displays, while comprising factual disputes, turn ultimately on questions of law. Harris v. City of Zion, 927 F.2d 1401, 1402 n. 1 (7th Cir.1991); Mather v. Village of Mundelein, 864 F.2d 1291, 1292 (7th Cir.1989).[9] In American Jewish Congress v. City of Chicago, 827 F.2d 120, 123 (7th Cir.1987), we explicitly acknowledged that the opposing parties contested factual issues relating to the display of a creche in City Hall. However, disputes over the constitutionality of a religious display involve "conclusions of law rather than facts." Id. The existence of factual disputes does not preclude summary judgment, because "none [of the disputes] raises a material issue that would require a remand for trial." Id.
 
 
 48
 The obligation imposed by Rule 56 of the Federal Rules of Civil Procedure to draw factual inferences in a light most favorable to the non-moving party applies only to this Court's review of genuine material facts. In this case, no genuine issues of material fact prevent the entry of summary judgment. Because the undisputed facts provide an adequate basis on which this Court may predicate its legal conclusion, further fact-finding is unnecessary. Bender v. Williamsport School Dist., 741 F.2d at 542 n. 3. This is evidenced further by the Jaycees' own prayer for relief. The Jaycees filed their own cross-motion for summary judgment asking this Court to reverse the lower court and enter summary judgment in favor of the defendants.
 
 II. DISCUSSION
 A. The Purposes of the Establishment Clause
 
 49
 Of late, Establishment Clause inquiries by courts have revolved around detailed inquiries into the specific facts surrounding each challenged practice. As a result, the decision as to whether a religious display passes constitutional muster on its facts overshadows the broader principles for which the Establishment Clause stands--namely, that courts must afford protection from "three main evils * * * sponsorship, financial support, and active involvement of the sovereign in religious activity." Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), quoting Walz v. Tax Comm'n, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). Thus in case after case, typically involving yuletide displays of a Nativity scene or other religious symbols, the Supreme Court and lower courts have alternatively upheld or struck down individual displays, relying upon an application of the Supreme Court test, first enunciated in Lemon, 403 U.S. at 602, 91 S.Ct. at 2105, clarified by Justice O'Connor in several concurring opinions and finally adopted by two Justices in County of Allegheny v. ACLU, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (creche displayed on Grand Staircase of County Courthouse unconstitutional; Chanukah menorah, displayed alongside large Christmas tree and sign saluting liberty constitutional). See also Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (creche that was part of an overall holiday display constitutional); American Jewish Congress, 827 F.2d at 120 (creche displayed in lobby of city hall unconstitutional); Mather, 864 F.2d at 1291 (creche displayed alongside many other secular symbols constitutional); Congregation Lubavitch v. City of Cincinnati, 923 F.2d 458 (6th Cir.1991) (City's prayer for injunction to ban menorah from public forum unlikely to succeed on merits); Smith v. County of Albemarle, 895 F.2d 953 (4th Cir.1990) (display of creche by local Jaycees on public lawn in front of county office building unconstitutional), certiorari denied, --- U.S. ----, 111 S.Ct. 74, 112 L.Ed.2d 48 (1990); Americans United for Separation of Church and State v. City of Grand Rapids, 922 F.2d 303, 310 (6th Cir.1990) (religious group responsible for menorah display permitted to intervene in suit to exclude display from public plaza because group likely to succeed on merits and because menorah was private and carried a large and explicit disclaimer in an area where demographics make it unlikely that anyone would believe that Grand Rapids endorsed Judaism); McCreary v. Stone, 739 F.2d 716 (2d Cir.1984) (creche displayed in public park with no public financial assistance constitutional), affirmed sub nom. Board of Trustees v. McCreary, 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985); ACLU v. City of Birmingham, 791 F.2d 1561 (6th Cir.1986) (unadorned creche display on city hall property unconstitutional), certiorari denied, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986); Doe v. City of Clawson, 915 F.2d 244 (6th Cir.1990) (combined display of creche and secular symbols constitutional); cf. Harris v. City of Zion, 927 F.2d 1401 (7th Cir.1991) (municipal seal of Rolling Meadows and seal, emblem and logo of Zion represent unconstitutional uses of Christian symbolism, e.g., a Latin cross); Doe v. Village of Crestwood, 917 F.2d 1476 (7th Cir.1990), petition for certiorari filed, 59 U.S.L.W. 3726 (U.S. Apr. 23, 1991) (No. 90-1573) (government-sponsored Roman Catholic mass celebrated in public park during Italian cultural festival unconstitutional); ACLU v. City of St. Charles, 794 F.2d 265 (7th Cir.1986) (display of cross atop city firehouse during Christmas season unconstitutional), certiorari denied, 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403; Kaplan v. City of Burlington, 891 F.2d 1024 (2d Cir.1989) (unattended, solitary display of a menorah in a public park over a ten-day period unconstitutional), certiorari denied, --- U.S. ----, 110 S.Ct. 2619, 110 L.Ed.2d 640; Gilfillan v. City of Philadelphia, 637 F.2d 924(3d Cir.1980) (expenditure of city funds for platform and cross used by Pope John Paul II to celebrate Mass and deliver sermon unconstitutional), certiorari denied, 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 845 (1981).
 
 
 50
 Before turning to the specific application of Lemon and Allegheny to the facts of the Jaycees' display, this Court recognizes that constitutional debates over the application of the Establishment Clause not only arise over the proper application of the constitutional tests articulated by the Supreme Court, but also over first principles--in this case, an understanding of the purpose of and intent behind the constitutionally mandated separation of church from state.[10] Unlike other paradigmatic constitutional debates, like that over the Due Process Clause of the Fourteenth Amendment or the constitutional right to privacy, in which one side, advocating a more restrictive reading of the scope of particular constitutional provisions, reads the Constitution in light of the original intent of the Framers, while the other views the inquiry as futile and instead applies constitutional commands to contemporary societal conditions--here both sides argue vociferously for adherence to original intent. As one noted scholar of the religion clauses has stated:
 
 
 51
 Because there is an unusual abundance of historical evidence, and because there is ample evidence to support both sides, both sides appeal to history. Those who would invalidate government action abandon their usual argument that original intent is not binding, and instead urge that this time original intent is on their side. That tactical choice tells you something about the perceived legitimacy and persuasive power of original intent arguments. Despite their many problems, they have an almost irresistible appeal.
 
 
 52
 Douglas Laycock, Text, Intent, and the Religion Clauses, 4 NOTRE DAME J.L. ETHICS & PUB. POL'Y 683, 685 (1990).
 
 
 53
 It is important to recognize what is at stake. The best illustration can be found in the recent Establishment Clause opinions of the Supreme Court and this Court in which a split has emerged. On one side are those Justices and Judges, more often in the majority than not, who adhere to the view that:
 
 
 54
 [I]t is not within the power of government to invade * * * [the inviolable citadel of the individual heart and mind], whether its purpose or effect be to aid or oppose, to advance or retard. In the relationship between man and religion, the State is firmly committed to a position of neutrality.
 
 
 55
 School Dist. of Abington Township v. Schempp, 374 U.S. 203, 226, 83 S.Ct. 1560, 1574, 10 L.Ed.2d 844.
 
 
 56
 Adherents of this position look to the original intent of the religion clauses of the Constitution to conclude that the Framers of the Establishment Clause intended to provide protection against any governmental intrusion on religious liberty and that all forms of government aid to religion are unconstitutional. They find support in the text of the Clause itself, the legislative debates surrounding the adoption of the text of the First Amendment, the debates in the revolutionary states over questions of church-state relations, and the history of religious persecution that provided a background to the debates over the adoption of the Establishment Clause. In addition, supporters of the view that the Framers drafted the Establishment Clause to protect freedom of religious belief and to commit the state to a position of neutrality vis-a-vis questions of conscience, look to statements by Thomas Jefferson and James Madison, champions of the disestablishment of religion at the time that the new nation defined itself. From Jefferson, we have the oft-quoted letter to the Danbury Baptist Association, in which he wrote that "I contemplate with sovereign reverence that act of the whole American people which declared that their legislature 'should make no law respecting an establishment of religion, or prohibiting the free exercise thereof,' thus building a wall of separation between church and State." 8 WRITINGS OF THOMAS JEFFERSON 113 (H. Washington ed. 1861).
 
 
 57
 James Madison, who played a large role in the drafting and passage of the Bill of Rights, also provides support for the view that the Framers intended the Establishment Clause to have broad application. In his "Memorial and Remonstrance Against Religious Assessments," Madison wrote:
 
 
 58
 The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. * * * We maintain therefore that in matters of Religion, no man's right is abridged by the institution of Civil Society, and that Religion is widely exempt from its cognizance.
 
 
 59
 James Madison, "Memorial and Remonstrance Against Religious Assessments, 1785" at para. 1, reprinted in Wallace v. Jaffree, 472 U.S. 38, 53-54 n. 38, 105 S.Ct. 2479, 2487-2488 n. 38, 86 L.Ed.2d 29 (1985).
 
 
 60
 Justice Brennan, an avowed skeptic of the utility of inquiring into original intent of the Framers, nevertheless relied upon his understanding of their purpose in writing to uphold a prohibition on the recitation of the Lord's Prayer in a public school:
 
 
 61
 [N]othing in the text of the Establishment Clause supports the view that the prevention of the setting up of an official church was meant to be the full extent of the prohibitions against official involvements in religion. * * * [T]he history which our prior decisions have summoned to aid interpretation of the Establishment Clause permits little doubt that its prohibition was designed comprehensively to prevent those official involvements of religion which would tend to foster or discourage religious worship or belief.
 
 
 62
 Abington School District v. Schempp, 374 U.S. at 233-234, 83 S.Ct. at 1577-1578 (Brennan, J., concurring).
 
 
 63
 On the other side of the historical debate, supporters of the view that certain forms of governmental aid to religion are appropriate offer an alternative version of the Founders' original intent. In Wallace v. Jaffree, Justice Rehnquist launched the judicial attack on a broad reading of the Establishment Clause. He set out to correct what he called a "mistaken understanding of constitutional history," Wallace, 472 U.S. at 91, 105 S.Ct. at 2508, and concluded that:
 
 
 64
 The Framers intended the Establishment Clause to prohibit the designation of any church as a "national" one. The Clause was also designed to stop the Federal Government from asserting a preference for one religious denomination or sect over others. Given the 'incorporation' of the Establishment Clause as against the States via the Fourteenth Amendment in Everson, States are prohibited as well from establishing a religion or discriminating between sects. As its history abundantly shows, however, nothing in the Establishment Clause requires government to be strictly neutral between religion and irreligion, nor does that Clause prohibit Congress or the States from pursuing legitimate secular ends through nondiscriminatory sectarian means.
 
 
 65
 Id. at 113, 105 S.Ct. at 2519 (Rehnquist, J., dissenting).
 
 
 66
 Under this approach, nothing in the Establishment Clause's history prevents a generalized endorsement of religion, leading Justice Rehnquist to vote to uphold school prayer in the Alabama schools. Id. at 114, 105 S.Ct. at 2519. The narrower understanding of the Establishment Clause he put forward was embraced more recently by Justice Kennedy in his concurring and dissenting opinion in Allegheny. Under this approach, Justice Kennedy would jettison the traditional Establishment Clause analysis as applied by Justice Blackmun in his majority opinion in Allegheny, in favor of a "coercion" or "prosyletization" approach. See also Board of Educ. v. Mergens, --- U.S. ----, 110 S.Ct. 2356, 2376, 110 L.Ed.2d 191 (Kennedy, J., concurring). Noting that the display of a creche in a public space, Lynch, 465 U.S. at 668, 104 S.Ct. at 1355; tax exemptions to churches, Walz v. Tax Comm'n, 397 U.S. at 664, 90 S.Ct. at 1409; government programs supplying textbooks to students in parochial schools, Board of Educ. v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); and a public school system's program to give students part of the day off to attend religious classes, Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), all represented permissible accommodation of religion, he went on to say:
 
 
 67
 The ability of the organized community to recognize and accommodate religion in society with a pervasive public sector requires diligent observance of the border between accommodation and establishment. Our cases disclose two limiting principles: government may not coerce anyone to support or participate in any religion or its exercise; and it may not, in the guise of avoiding hostility or callous indifference, give direct benefits to religion. * * *
 
 
 68
 Allegheny, 492 U.S. at 659, 109 S.Ct. at 3136 (Kennedy, J., concurring in the judgment in part and dissenting in part). Under this approach, the state's so-called passive and symbolic recognition of religion would not violate the Establishment Clause, so that religious displays that fall short of actually "establishing" a religious faith would pass muster under this "coercion" test.
 
 
 69
 This view has found support in dissenting opinions of this Court. In American Jewish Congress, 827 F.2d at 120, the majority held unconstitutional a display of a nativity scene in Chicago City Hall, applying the secular purpose and endorsement prongs of Lemon and citing in support of this decision a broad view of the Establishment Clause's prohibitions. Dissenting from this decision, Judge Easterbrook criticized the content- and context-specific approach required in applying the Lemon test, instead advocating the adoption of the "coercion" approach. Conducting his own review of the constitutional history of the Establishment Clause, the dissent concluded that "force or funds are essential ingredients of an 'establishment.' " American Jewish Congress, 827 F.2d at 137 (Easterbrook, J., dissenting). However, this approval of the coercion approach was tempered by the appropriate caveat: "I offer this conclusion in the spirit of constructive criticism, because it is plainly not the law today." Id. More recently, in Crestwood and Zion, Judge Easterbrook repeated his criticism of Lemon, charging that it "has lost its tang." Zion, 927 F.2d at 1424 (Easterbrook, J., dissenting). Although Judge Easterbrook reiterated his own view that the Establishment Clause forbids "taxation and coercion in support of religion," while permitting the display of religious symbols, id. at 1423, he believes that under Allegheny, an appellate court may abandon Lemon in favor of Justice O'Connor's endorsement analysis. Id. at 1425. Under the endorsement test, Judge Easterbrook would have held the two municipal seals at issue in Zion unconstitutional.
 
 
 70
 Although the debate over the original intent behind the Establishment Clause continues to rage, we decline to jump into the fray by conducting yet another exhaustive review of the Framers' intent by scouring primary sources such as legislative debates, the writings of individual Framers, the state debates over church-state issues, or the history of religious persecution as it existed at the time that the Bill of Rights was passed. There is no need to do so here, for a proper understanding of the original intent prevents this Court from sustaining the explicit, preferential accommodation of religion by government that occurred in this case.
 
 
 71
 The Establishment Clause means that government may not prefer one religion over another, nor may it aid all religions evenhandedly. Both types of aid effected, in the Founders' view, an establishment of religion. See Laycock, "Nonpreferential" Aid to Religion: A False Claim About Original Intent, 27 WM. & MARY L. REV. 875, 878 (1986). Coercion certainly falls within the cognizance of this definition, but coercion is not all that the Establishment Clause was intended to or has been interpreted to proscribe. On the contrary, "establishment" means much more than coercion--it means acts of the state that place the imprimatur of governmental approval upon a religious creed or belief. Governmental acts such as placing a nativity scene in city hall, mandating school prayer in the public schools, or, as in this case, expressly endorsing the presentation of a private religious display on public property, represent state endorsement of one faith over another, with the result that the endorsement "sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." Lynch, 465 U.S. at 688, 104 S.Ct. at 1367 (O'Connor, J., concurring).[11]
 
 
 72
 Our conclusion in this case must be tempered by a recognition that while history is helpful in determining which problems the Framers were attempting to solve, "an awareness of history and an appreciation of the aims of the Founding Fathers do not always resolve concrete problems." Abington School District v. Schempp, 374 U.S. at 234, 83 S.Ct. at 1578 (Brennan, J., concurring); see also Laycock, Text, Intent, and the Religion Clauses, 4 NOTRE DAME J.L.ETHICS & PUB.POL'Y 683, 696-697 (1990). In his concurrence in Abington School District v. Schempp, Justice Brennan cautioned against a "too literal quest for the advice of the Founding Fathers upon the issues of [the case at hand]," 374 U.S. at 237, 83 S.Ct. at 1579. In sum, original intent reminds us that courts in particular cases might apply the constitutional test differently, but they "cannot diminish in any way the force of the command" that "government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions)." Allegheny, 492 U.S. at 605, 109 S.Ct. at 3107, quoting Larson v. Valente, 456 U.S. 228, 244, 102 S.Ct. 1673, 1683, 72 L.Ed.2d 33 (1982).
 
 B. The Constitutional Tests
 
 73
 Our recognition here that the Framers intended the Establishment Clause to forbid governmental endorsement of religion provides the backdrop for a contextual and content-based examination of the paintings in the Park in accordance with modern-day Establishment Clause jurisprudence.
 
 
 74
 The resolution of this case depends upon an application of one of two tests, both of which have been approved by shifting majorities of Supreme Court Justices in their attempt to articulate a principled approach to Establishment Clause jurisprudence. The first test, containing three prongs, was articulated by the Supreme Court in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, and has become known as the Lemon test: "[A] statute or practice which touches upon religion, if it is to be permissible under the Establishment Clause, must have a secular purpose; must neither advance nor inhibit religion in its principal or primary effect; and must not foster an excessive entanglement with religion." Lemon, 403 U.S. at 612-613, 91 S.Ct. at 2111. In Establishment Clause cases involving the constitutionality of a religious display, the courts have applied the prongs of this test to the various factual circumstances--its physical setting, its proximity to the seat of governmental power, its position on public property, the presence or absence of secular objects that might mitigate the religious effect of the display, its history and ubiquity, and the degree of government approval or sponsorship of the display.
 
 
 75
 While the lower courts have used the Lemon test to draw lines in Establishment Clause cases, the Supreme Court itself has resisted wholeheartedly adopting the test in every case. Indeed in Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, in upholding the display of a creche by the city of Pawtucket, Rhode Island, the Court recognized the usefulness of the Lemon test but stated that "we have repeatedly emphasized our unwillingness to be confined to any single test or criterion in this sensitive area." Lynch, 465 U.S. at 679, 104 S.Ct. at 1362. Despite this caveat, Chief Justice Burger applied the three prongs of the Lemon test in his majority opinion, finding, e.g., a legitimate secular purpose (in satisfaction of prong one) in the display of the creche on the facts of that case. Lynch, 465 U.S. at 681, 104 S.Ct. at 1363. However, in her concurrence, Justice O'Connor voted to uphold the display based on a variation of the Lemon test, stating:
 
 
 76
 Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion. In making that determination, courts must keep in mind both the fundamental place held by the Establishment Clause in our constitutional scheme and the myriad, subtle ways in which Establishment Clause values can be eroded.
 
 
 77
 Lynch, 465 U.S. at 694, 104 S.Ct. at 1370. Justice O'Connor emphasized the second prong of the Lemon test (primary effect to endorse religion), believing it to be dispositive to Establishment Clause analysis. The endorsement test as refined focuses on the content and context of a display to determine whether a governmental body has run afoul of the Establishment Clause.
 
 
 78
 In County of Allegheny v. ACLU, 492 U.S. 573, 109 S.Ct. 3086, Justice Blackmun, writing the opinion of the Court, reviewed the Supreme Court's decision in Lynch and applied the endorsement test to uncover the underlying constitutional principle: "[T]he government's use of religious symbolism is unconstitutional if it has the effect of endorsing religious beliefs, and the effect of the government's use of religious symbolism depends upon its context." Allegheny, 492 U.S. at 593-598, 109 S.Ct. at 3101-3103. Justice Blackmun employed Justice O'Connor's approach, noting that it "provides a sound analytical framework for evaluating governmental use of religious symbols." Allegheny, 492 U.S. at 595, 109 S.Ct. at 3102. In evaluating the constitutionality of the creche displayed in the foyer of the county courthouse and the menorah placed in front of City Hall, the Court in Allegheny viewed its task as "determin[ing] whether the display of the creche and the menorah, in their respective 'particular physical settings,' has the effect of endorsing or disapproving religious beliefs." Allegheny, 492 U.S. at 597, 109 S.Ct. at 3103.
 
 
 79
 In Allegheny, the Supreme Court's decision demonstrates the challenge posed to a reviewing court by a content-based, contextual approach to the Establishment Clause. While the Supreme Court, on the one hand, found unconstitutional a creche displayed on the grand staircase inside the Allegheny County Courthouse, on the other, the Court in the very same case upheld the display of a Chanukah menorah in front of the City-County Building. In reaching its decision as to the creche, the Court concluded that the content and context of the creche display endorsed a patently Christian message: "Glory to God for the birth of Jesus Christ." Allegheny, 492 U.S. at 601, 109 S.Ct. at 3105.
 
 
 80
 The display of the menorah presented "a closer constitutional question" than the creche. Id. 492 U.S. at 613, 109 S.Ct. at 3111-3112. The majority (albeit a different one than voted to find the county's display of a creche unconstitutional) held that the menorah, because of its placement alongside a large Christmas tree and a sign bearing the Mayor's name and the slogan, "Salute to Liberty," did not "have an effect of endorsing religious faith." Id. at 620-621, 109 S.Ct. at 3115. Because of the shifting majority in Allegheny, in which only two Justices, Blackmun and O'Connor, voted to find the creche unconstitutional and the menorah constitutional, whereas three Justices, Brennan, Marshall and Stevens, voted to find both the creche and the menorah to be unconstitutional, and three Justices, Rehnquist, Scalia and Kennedy, voted to find both displays constitutional, this Court has to be especially diligent in applying Establishment Clause jurisprudence.
 
 
 81
 Fortunately in this case the constitutional question is not close. The Jaycees' display of the paintings fails the first two prongs of the Lemon test[12] as elaborated in Allegheny. It is patently inconsistent with the time-tested, venerable command of the Establishment Clause that:
 
 
 82
 [G]overnment may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs.
 
 
 83
 Allegheny, 492 U.S. at 590-591, 109 S.Ct. at 3099. This constitutional edict remains in force even in cases in which a private actor claims responsibility for the religious expression at issue. The dissent charges this Court with invoking an improper analytical framework in its application of the Lemon and endorsement tests rather than viewing the display as constitutionally protected private expression. As the dissent would have it, assertedly private speech is exempt from Establishment Clause analysis. This begs the question, however. It is precisely through the application of the Lemon and endorsement tests that a reviewing court makes a determination whether expression is private or whether it bears the imprint of government endorsement. A government may not evade the constitutional obligations imposed by the Establishment Clause by seeking refuge in the protective mantle afforded to private actors by the freedom of speech and expression clause of the First Amendment.
 
 1. Secular Purpose under Lemon
 
 84
 Through the pronouncements and actions taken in support of the display of the paintings, the Jaycees have obviated any claim that the display satisfies the secular purpose prong of the Lemon test. Unlike a Christmas tree, recognized by the Supreme Court in Allegheny, 492 U.S. at 616, 109 S.Ct. at 3113, and by this Court to be a secular symbol of the holiday season, Lubavitch Chabad House, Inc. v. City of Chicago, 917 F.2d 341, 343 (7th Cir.1990), the paintings are undeniably religious in nature. They portray sixteen scenes in the life of Jesus which together encapsulate the essential religious message of Jesus' life to Christians. As already noted, only three of the paintings have anything to do with the Christmas holiday and the story of Jesus' birth. And even those paintings relate the religious background of the holiday, particularly when viewed as part of an overall religious display in which thirteen paintings have no connection whatsoever to the secular celebration of the Christmas holiday season. The Jaycees fail in their argument to overcome the core of the paintings' spiritual nature by attempting to manufacture a secular purpose out of whole cloth.
 
 
 85
 The Jaycees contend that the display satisfies the Establishment Clause test as articulated in Lemon. However, they fail in their main brief even to address the secular purpose prong of Lemon as it relates to these facts. The Jaycees state that the Supreme Court in Lynch found a secular purpose in the display of the creche--namely, the celebration of Christmas and its origins. From this statement, they infer that the paintings in the municipal Park share the same purpose and therefore satisfy the first prong of Lemon. However, in his incisive opinion below, the district judge recognized the Jaycees' unconstitutional purpose in effecting a governmental endorsement of religion.
 
 
 86
 First, the district judge rightly pointed to the City Council's Resolution, passed in 1986 at the same time that the City granted the Jaycees permission to construct new concrete-filled holes with metal sleeves to support the paintings. As noted above, the City not only rejected Richard Rohrer's complaint and granted permission to the Jaycees to display the paintings for another season, but it passed the following Resolution:
 
 
 87
 NOW, THEREFORE, BE IT RESOLVED by the City Council of the City of Ottawa, that after due consideration and reflection upon the complaint raised concerning the pictures in Washington Park, that the Council endorse the activities of the Ottawa Jaycees in maintaining, erecting, dismantling and storing said pictures and incorporating them in the overall Christmas display that annually graces the downtown area of the City and further thanks all the other groups, public and private, who also maintain, erect, dismantle and store other portions of the Christmas decorations which are integral to the annual Yuletide season and the spirit thereof.
 
 
 88
 (City Council Resolution, Dec. 2, 1986, Plaintiff's App. 33) (emphasis supplied). On its face, the constitutional defect of the Resolution is readily apparent. The City did not try to hide its approval of the religious display and even used the word "endorse" to express its support. In view of the judicial test for Establishment Clause violations, the City's use of this word to describe its support for the display is enlightening. When considered along with the rest of the Christmas displays, the City reserved its special plaudit for the Jaycees' pictures. In explicitly endorsing the Jaycees' display, the City made no acceptable attempt to articulate a secular purpose for doing so.[13] A "statute should be held to have an improper purpose * * * [since] it is beyond purview that endorsement of religion or a religious belief 'was and is the law's reason for existence.' " Wallace v. Jaffree, 472 U.S. at 75, 105 S.Ct. at 2499 (O'Connor, J., concurring), citing Epperson v. Arkansas, 393 U.S. 97, 108, 89 S.Ct. 266, 272, 21 L.Ed.2d 228 (1968). In this case, it is beyond dispute that endorsement of religion was the reason for the display.
 
 
 89
 The Jaycees advance three other secular purposes for the display in their attempt to pass the secular purpose prong of the Lemon test. First, they claim that the City's policy of permitting the display represented a permissible accommodation of religion. In their brief, the Jaycees point to the City's "policy of equal access" and to its participation in the celebration of the Christmas season as a permissible accommodation that allows the Jaycees to display the pictures in the Park.
 
 
 90
 The history of City sponsorship and support of the display provides no evidence to the district court of the actual content and application of the City's claimed "equal access" policy. The record plainly shows that the pictures in the Park have been the only display to be mounted in the Park annually for any long period of time. While the City may permit an occasional festival, concert, or presidential campaign appearance to be held in the Park,[14] it has been telling "The Greatest Story Ever Told" to passers-by for more than a generation. Moreover, the City has not permitted any other group to install permanent foundations to support their displays.[15] Only the Jaycees' claimed "equal access" earned them the explicit endorsement and input of the City in designing the concrete-filled holes and metal sleeves especially to support the paintings. In applying its "policy" of equal access, the City apparently believes that some groups are more equal than others!
 
 
 91
 The dissent reprints the list of one-time events that, according to the City clerk, took place in the Park and reprimands the majority for failing to draw reasonable inferences in a light most favorable to the non-moving party. Dissent at 793-794. However, the plaintiff does not dispute that the one-time events took place. Neither the occurrence of events in the Park, nor the fact that a park is generally considered to be the quintessential public forum, Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423, (1939), establishes that the City employed an open access policy with regard to the Park. The existence of an equal access policy is clearly an ultimate question, a constitutional fact that requires this Court to review the record de novo. As such, this Court is under no obligation to draw inferences favorable to the non-moving party. The mere assertion of a policy by the Jaycees does not mean that it exists in light of the record in this case, which supports the conclusion that the City had no policy at all. The City's laissez-faire approach becomes clear in Mayor Small's responses to plaintiff counsel's questions at a deposition:
 
 
 92
 [BY MS. GOLDEN:]
 
 
 93
 Q. What is the City's policy concerning the display of property in its park system?
 
 
 94
 A. [BY MAYOR SMALL:] First come, first serve.
 
 
 95
 Q. And I take it * * * that the policy first come, first serve is not written in any documents which the City uses in enforcing its policy?
 
 
 96
 A. There's nothing in granite.
 
 
 97
 Q. How about in ink?
 
 
 98
 A. There you go. Not that I know of, okay.
 
 
 99
 Q. And that's the policy that you followed since 1971 in making the decisions as to the use of Washington Park and every other park in the City of Ottawa; is that correct?
 
 
 100
 A. Not necessarily, no.
 
 
 101
 (Deposition of Mayor George D. Small at 22, Plaintiff's Exhibit No. 57.) Mayor Small then suggested that the City would permit any display "[a]s long as it didn't have a safety factor to it." Id. at 23. However, with respect to the paintings, Mayor Small admitted that no safety determination was ever made. Id. at 24. When pressed by plaintiff's counsel to identify the safety factors or the extent to which the City would permit a permanent display or structural addition to the Park, Mayor Small's responses indicated that subjective determinations, rather than an articulated policy, characterized the City's approach to the use of its parks.
 
 
 102
 Furthermore, while many varieties of expression must be tolerated in a public forum to guarantee freedom of expression, the Establishment Clause prevents the government from endorsing a religious message, even if the message is expressed in a public forum. A government may not avoid the constitutional command of the Establishment Clause by channelling its endorsement through a private speaker's religious expression in a public forum. See discussion in Part II.B.2.c. infra.
 
 
 103
 The Jaycees offer an additional secular purpose for the display: that it is part of the celebration of the Christmas holiday season. By offering this as a justification, the Jaycees cannot escape an analysis of the display's content and context to determine whether it rises to an unconstitutional endorsement of its religious message by the City. Indeed, where a city's display of an undeniably religious symbol has been upheld, see Allegheny, 492 U.S. at 573, 109 S.Ct. at 3086; Lynch, 465 U.S. at 668, 104 S.Ct. at 1355; Mather, 864 F.2d at 1291; McCreary, 739 F.2d at 716; Clawson, 915 F.2d at 244, the analysis turns on the extent to which the religious message is either "neutralized" by the presence of other secular symbols or messages, or is part of an overall, integrated holiday display. The Jaycees cannot seriously contend that sixteen large paintings depicting seminal events in the life of Jesus represent nothing more than an attempt by the City to celebrate the holiday season by inviting the Jaycees to mount the paintings annually in the Park. The claim that the paintings further the secular aspects of the Christmas season demonstrates an insensitivity to the religious importance of Jesus' life to Christians and demeans whatever meaning the paintings hold by equating them with the secular symbols of the season, such as the Christmas Tree, the bow, lights, or a 15-foot snowman. As Justice Brennan observed in his concurrence in Abington School District v. Schempp, 374 U.S. at 259, 83 S.Ct. at 1591, "[i]t is not only the nonbeliever who fears the injection of sectarian doctrines and controversies into the civil polity, but in as high degree it is the devout believer who fears the secularization of a creed which becomes too deeply involved with and dependent upon the government."
 
 
 104
 Even if we accept the Jaycees' contention that the paintings' purpose was to celebrate the holiday season, this does not mean that they may fulfill this purpose in an unconstitutional manner by obtaining the endorsement of the City. Allegheny teaches that the state may not accommodate religion by endorsing a religious display and then justify this endorsement as an appropriate accommodation to remove burdens on free expression or the free exercise of religion. Discussing this principle with reference to the creche displayed on the Grand Staircase of the Allegheny County Courthouse, Justice Blackmun wrote:
 
 
 105
 The display of a creche in a courthouse does not remove any burden on the free exercise of Christianity. Christians remain free to display creches in their homes and churches. To be sure, prohibiting the display of a creche in the courthouse deprives Christians of the satisfaction of seeing the government adopt their religious message as their own, but this kind of government affiliation with particular religious messages is precisely what the Establishment Clause precludes.
 
 
 106
 Allegheny, 492 U.S. at 601 n. 51, 109 S.Ct. at 3105 n. 51. In this case, the paintings are but one of many ways that Ottawa celebrates the Christmas holiday season. However, the paintings, unlike the accompanying lights, bows, candles, Santa Claus house or 15-foot snowman, pronounce a Christian message by graphically recounting the story of the life of Jesus Christ. Therefore, the City's involvement with the paintings gives rise to an unconstitutional establishment of religion and represents an impermissible way for the City to fulfill the secular purpose of celebrating the Christmas holiday season.[16]
 
 
 107
 The Jaycees advance one more secular purpose for the display: "the promotion of shopping and the transaction of business." In evaluating this proposed secular purpose, the analysis is the same. Although this purpose may in fact be secular, the City must show that there is a particularly good reason for the City to accomplish its purposes through religious means. Thus in a case where a governmental body advanced the promotion of tourism as its secular purpose in placing a Latin cross atop the local fire station, the Eleventh Circuit concluded that: "Although the promotion of tourism is a secular goal commonly pursued by states, cities and counties alike, a government may not 'employ religious means to reach a secular goal unless secular means are wholly unavailing.' " ACLU v. Rabun County Chamber of Commerce, 698 F.2d 1098, 1111 (11th Cir.1983) (illuminated Latin cross affixed to 85-foot structure in a State park held unconstitutional), citing Abington School District v. Schempp, 374 U.S. at 294, 83 S.Ct. at 1609 (Brennan, J., concurring). It does not require much creativity to imagine many other ways of promoting commerce or tourism in Ottawa far more effective and less disrespectful than mounting the display containing an undeniably religious message in a public park. As the Eleventh Circuit recognized, a particularly searching examination of the avowed secular purpose is required when the government allows a religious symbol to be erected in a public space. Rabun, 698 F.2d at 1110. Despite the usual deference of courts to statements of legislative purpose, the Constitution prevents us from acquiescing in the Jaycees' attempt to articulate a secular purpose where really none is to be found. The Jaycees have failed to convince this Court that the City has satisfied the secular purpose requirement of Lemon.
 
 
 108
 2. Advancement or Inhibition of Religion under Lemon
 
 
 109
 The second prong of the Lemon test examines whether the primary effect of the practice advances or inhibits religion. In recent years, this has become the linchpin of Establishment Clause analysis. As set forth in Lemon, a statute or practice that touches upon religion is impermissible under the Establishment Clause if it advances or inhibits religion in its principal or primary effect. Lemon, 403 U.S. at 612-613, 91 S.Ct. at 2111. In contrast to the secular purpose prong of Lemon, where courts will have before them some explicit manifestation of secular purpose which can then be subjected to judicial scrutiny, the "effects" prong of Lemon requires courts to conduct a fact-specific inquiry into the content and context of the display itself. As noted above, Justice O'Connor, in an attempt to resolve the inherent ambiguities of this prong, has analyzed Establishment Clause cases by emphasizing effects of the practice under the rubric of the endorsement test (or the "no endorsement" test as some courts and commentators would have it). See Allegheny, 492 U.S. at 623, 109 S.Ct. at 3117; Lynch, 465 U.S. at 687, 104 S.Ct. at 1366; Wallace v. Jaffree, 472 U.S. at 67, 105 S.Ct. at 2495 (O'Connor, J., concurring).
 
 
 110
 In ascertaining the effect of the paintings, the Supreme Court in Allegheny enunciated the steps that a court should take. First, the Establishment Clause plainly does not permit endorsement, favoritism or promotion of religion. Id. 492 U.S. at 593-594, 109 S.Ct. at 3101. On the contrary, any endorsement of religion is invalid when it "convey[s] a message that religion or a particular religious belief is favored or preferred." Allegheny, 492 U.S. at 593, 109 S.Ct. at 3101, citing Wallace v. Jaffree, 472 U.S. at 70, 105 S.Ct. at 2497 (O'Connor, J., concurring) (emphasis supplied).
 
 
 111
 Second, Allegheny articulates the method for determining here whether the pictures in the Park have the effect of endorsing religion: "[T]he question is 'what viewers may fairly understand to be the purpose of the display.' " 492 U.S. at 595, 109 S.Ct. at 3102. This understanding, of course, depends upon the content of the message and the context of the display. An examination of the content and context of the display, the Allegheny opinion rightly notes, requires that the unique circumstances of a display be scrutinized to determine whether it gives rise to governmental endorsement of religion. Id. There is no need in the following analysis of content and context here to split hairs to arrive at a decision. This analysis will demonstrate clearly the extent to which the content and context of this display effect an endorsement of religion by the City.
 
 
 112
 a. The content of the paintings
 
 
 113
 The content of the display is undeniably religious. The paintings pictorially narrate important events in the life of Jesus Christ. As the description of each painting in Part I.A. demonstrates, the paintings convey core beliefs of Christianity--the birth of a Saviour, the miracles that he performed, his spiritual teachings, his crucifixion, and his resurrection. Only three of the paintings depict New Testament scenes arguably related to Christmas and to a creche (the infant Jesus in the manger, the announcement of his birth to the shepherds and the visitation of the three wise men), and these too promote a religious message when considered alone or alongside the other thirteen paintings.
 
 
 114
 The remaining paintings convey different messages associated with a range of Christian holidays and with events in Jesus' life taking place long after his birth. To the extent that most of the paintings bear no direct relation to Christmas, the pictures in the Park are more like a cross than a creche. Therefore, this Court's analysis and decision in ACLU v. City of St. Charles, 794 F.2d 265 (1986), certiorari denied, 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403, is particularly applicable. St. Charles affirmed an injunction issued against the display of a cross atop a city firehouse. There we distinguished between the public display of a Nativity scene, which has been upheld at times because of its close connection to the secular celebration of Christmas, and the display of a Latin cross, which calls to mind a very different message, one that is inconsistent with the Christmas holiday:
 
 
 115
 When Christmas is considered in its secular signification, as a public holiday for Americans of whatever system of religious belief (or nonbelief), the introduction of the cross into the Christmas celebration strikes a discordant chord; for most Americans do not like to think about death in connection with birth. At any rate the cross is not in fact a common Christmas symbol, as far as any member of this panel is aware or the record shows.
 
 
 116
 St. Charles, 794 F.2d at 273. The thirteen paintings are like the Latin cross, in our analysis, because they encapsulate aspects of Christianity that do not bear any relation specifically to the story of Christmas. Christians commemorate Christmas in different ways: through children's stories such as "The Little Drummer Boy" or through Christmas carols such as "Silent Night," "We Three Kings," "Hark, the Herald Angels Sing," and "What Child is This." All of them celebrate or recount the story of the birth of Jesus. None of them recall the events depicted in thirteen of the paintings. The story of the loaves and fishes, the baptism of Jesus, the road to Emmaus and the Last Supper simply do not figure into the story of the holiday in either its religious or secular variations. The court in St. Charles recognized that while the Nativity scene is "a vivid tableau of the birth of Jesus Christ," the cross calls to mind the "story of the death and resurrection of Christ, the story that moves only Christians deeply." Id. at 273.
 
 
 117
 Similarly, the pictures in the Park evoke in the mind of the observer much more than the story of Jesus' birth. Indeed, the name of the display itself, "The Greatest Story Ever Told," encompasses the life, crucifixion, and resurrection of Jesus--not just the Christian miracle of his birth. It is a Christian display, not a Christmas display. Indeed, the paintings proclaim and showcase the core tenets of the Christian religion by communicating the entire story of Jesus. While Allegheny recognized that a creche, in limited circumstances, might be permissible under the Establishment Clause, the City may not celebrate Christmas "in a way that endorses Christian doctrine." 492 U.S. at 601, 109 S.Ct. at 3105. Because the content is undeniably religious, it becomes necessary to turn to a consideration of the context of the display to determine whether a reasonable observer might conclude that the circumstances of the display overcome the message of endorsement to be derived from its content.
 
 
 118
 b. The context of the paintings
 
 
 119
 Allegheny mandates a close examination of the context of the display to determine whether its overall effect endorses religion. This requires consideration of several factors, the most important being its physical setting. Allegheny, 492 U.S. at 597-598, 109 S.Ct. at 3103. In Allegheny, the context was determinative in the Court's decision to find unconstitutional the display of the creche while upholding the display of the Chanukah menorah.
 
 
 120
 Before evaluating the context of the paintings, it is worth noting that the inquiry into context does not proceed based on any fixed criteria. The Supreme Court has identified physical setting as central to the inquiry. This makes sense when the constitutional question turns on whether the government has endorsed religion by erecting or permitting a display with religious content. However, this does not mean that the contextual inquiry proceeds without considering, where necessary, other elements of the context in addition to the physical setting. Webster's Third New International Dictionary defines "context" as "the interrelated conditions in which something exists or occurs." This definition corresponds with what Justice O'Connor identified as the proper approach for evaluating government practices that implicate the Establishment Clause: "Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion." Lynch, 465 U.S. at 694, 104 S.Ct. at 1370. In addition to setting, the context of the paintings also encompasses what the district judge called "their history and ubiquity"; the presence or absence of other holiday symbols in and around the display; and the nature of any written declarations on or near the display.
 
 
 121
 Consideration of the physical setting of the display involves several elements. First is the actual location of the display. The Court in Allegheny found unconstitutional the display of a creche on the Grand Staircase of the County Courthouse building. The creche there stood alone on the staircase in the foyer of the Courthouse. Id. 492 U.S. at 598-599, 109 S.Ct. at 3104. In this way, the display had the effect of endorsing Christianity by sending to observers of the creche and accompanying Latin cross the message that the religious aspects of Christmas were close to the seat of judicial power in the county.
 
 
 122
 Similarly, in American Jewish Congress, this Circuit held against the City of Chicago, finding that its display of a creche in City Hall violated the Establishment Clause. In reaching its decision, the Court applied the endorsement inquiry and concluded that the particular placement of the creche inside City Hall, a center of government functions and the seat of city and county governments, sent a message of endorsement to observers:
 
 
 123
 Because City Hall is so plainly under government ownership and control, every display and activity in the building is implicitly marked with the stamp of government approval. The presence of a nativity scene in the lobby, therefore, inevitably creates a clear and strong impression that the local government tacitly endorses Christianity.
 
 
 124
 American Jewish Congress, 827 F.2d at 128. Therefore, it was the placement of the creche in the lobby of the seat of government in Chicago that compelled us to conclude that the display violated the Establishment Clause.
 
 
 125
 The physical placement of the paintings in this case is admittedly different. Washington Park is three blocks away from City Hall but the Illinois Appellate Court, Third District, is directly across the street. While the message of endorsement here is different from cases where the religious display is placed at the center of government power (e.g., the lobby of a city hall), the placement of the paintings in the Park still effects an impermissible endorsement of religion. Government endorsement of a religious message, contrary to the Jaycees' suggestion, can be manifested in many ways. The constraints imposed on government by the Establishment Clause do not diminish as we move farther away from City Hall. Endorsement is equally unconstitutional regardless of whether the endorsement manifests itself on the steps of City Hall or in a public picnic area on the outskirts of town. In either case, courts must determine whether the government practice passes the endorsement test.
 
 
 126
 In addition, as noted in Part I.A., the paintings occupy much of the length of the entire western side of the Park.[17] When they are on display, they are visible so that passersby on LaSalle Street will view them night and day. The extent to which the paintings are a prominent fixture of the Park during the Christmas season and beyond supports the finding that the City, in approving this major display, endorsed its religious message.
 
 
 127
 The City, in allowing the construction of thirty-two new, concrete-filled holes and metal sleeves to support the paintings, has manifested its intent that their permanent home will be in the Park. The holes and metal sleeves were dug especially for the paintings--to date, they have supported no other display. The permanent presence of physical supports for the paintings sends a message that the government property provides a permanent home for an annual private religious display. Even when the paintings are not on display, the specially designed covered holes remind passers-by that the paintings' annual home is the Park.
 
 
 128
 The paintings' physical location is not the sole consideration for examining the context of the display. In addition to location, Allegheny also directs the Court's attention to the physical setting of a display. This inquiry was dispositive to a majority's finding unconstitutional the display of the creche, while at the same time upholding the display of the menorah. The Court distinguished its findings from its earlier decision in Lynch, where the Court found that the display of a creche alongside other secular symbols of the holiday season, each of which was a prominent part of the overall holiday display, did not send an overall message of endorsement. In Allegheny, the Court found that the creche was not part of an overall holiday setting: it sat alone in the foyer of the County Courthouse, framed by traditional flowers of the season and a Latin cross. Allegheny, 492 U.S. at 598-599, 109 S.Ct. at 3104. Rather than drawing attention away from the creche, those decorations served only to draw additional attention to the message within the frame. Id. In contrast, the Court found the display of the Chanukah menorah in front of the City-County Building to be a part of an overall holiday display, due to the placement of the menorah next to a large Christmas tree and a sign saluting liberty. Id. at 613-614, 109 S.Ct. at 3112. Because the tree is a judicially-recognized secular symbol of the Christmas season and the sign announced a secular theme of freedom, the Court considered the menorah to be the "acknowledgement of a contemporaneous alternative tradition." Id. at 617-619, 109 S.Ct. at 3114-3115. For these reasons, there was not an unconstitutional endorsement of religious faith, but rather "a recognition of cultural diversity."
 
 
 129
 The City of Ottawa was not blind to the Supreme Court's reasoning in Lynch and Allegheny. After deciding in 1986 not to remove the display of paintings from the Park, the City attempted to turn what had been a singular display of paintings into an "overall holiday display" that would pass muster under these decisions. In this effort, the City mistook the careful contextual consideration required by the "endorsement" test for a formalistic approach to this problem. The Jaycees would first have this Court ignore all the years during which the paintings stood alone in the Park and consider instead only those years when the City added its secular trimmings to the display. As demonstrated below, the history of the display is indispensable to this Court's contextual analysis. But even considering only the period when the paintings were accompanied by the "Festival of Lights," this attempt to "neutralize" the display of paintings must fail.
 
 
 130
 As Justice O'Connor recognized in Lynch, a creche has undeniable sectarian significance, and the presence of secular symbols does not neutralize the religious elements. Rather, the creche, despite its inherent religiosity, was constitutionally acceptable in Lynch because it was not the primary focus of the display and because the display, although state-sponsored, was situated in a privately owned park. The secular symbols were equally prominent both in their size and as separate visual foci of Pawtucket's Christmas arrangement. Additionally, the creche was part of the "overall holiday display" because it was an appropriate part of the celebration of the Christmas holiday.
 
 
 131
 Similarly in Allegheny, the Chanukah menorah was an admittedly religious symbol, but Justice Blackmun recognized that the city had "few reasonable alternatives that are less religious in nature." Allegheny, 492 U.S. at 618, 109 S.Ct. at 3114. Additionally, the menorah was placed alongside a secular symbol, the tree, and a secular slogan, the salute to freedom, diminishing the possibility that the city wished to endorse the Jewish religion. Id. at 617-619, 109 S.Ct. at 3114-3115. The Court concluded that the overall effect of this display was to emphasize the legacy of freedom and not to endorse Judaism. Id.
 
 
 132
 In contrast, the City in this case has attempted in vain to include the paintings as part of an overall holiday display in the Park. By installing a 15-foot-tall lighted snowman and stringing lights, bows, snowflakes and giant candles on the trees, the City has attempted to neutralize the religious content of the paintings, engaging in what one member of this Court has described as constitutional "interior-decorating," American Jewish Congress v. City of Chicago, 827 F.2d 120, 129 (7th Cir.1987) (Easterbrook, J., dissenting). Unfortunately for the City, to paraphrase this Court's decision in Crestwood, not even a battalion of giant snowmen or a blizzard of snowflakes would absorb the paintings into an overall holiday display. See Crestwood, 917 F.2d at 1479 ("[E]ven a herd of reindeer and a forest of jumbo candy canes could not neuter a mass--a religious observance that does substantially more than mark the birth of a figure with religious significance.").
 
 
 133
 The paintings, unlike a creche, do not lend themselves to becoming a part of an overall Christmas display. As already noted, with the exception of three of the paintings, the message of the display commemorates much more than the story of Jesus' birth. A painting of the Sermon on the Mount, the stilling of a lake storm, the Last Supper, or the crucifixion does not complement the secular symbols of Christmas to make an integrated Christmas holiday display--each canvas portrays religious elements of Christian theology.
 
 
 134
 Additionally, the physical setting of the display is more like the creche in Allegheny than the one in Lynch.[18] In Lynch, a majority voted to uphold the creche because it was part of a display of "a series of figures and objects, each group of which had its own focal point. Santa's house and his reindeer were objects of attention separate from the creche, and had their specific visual story to tell." Allegheny, 492 U.S. at 598, 109 S.Ct. at 3104. In contrast, the Allegheny Court emphasized the central position of the creche in the County Courthouse display: "[T]he creche stands alone: it is the single element of the display on the Grand Staircase." Id. While the City here has been careful lately to dot the landscape of the Park with secular accoutrements, they do not in any way overshadow the paintings. One snowman and an array of lights cannot absorb sixteen large paintings. Moreover, there is no conceivable synthesis, either aesthetic or otherwise, in a display containing the paintings and the other decorations. Most of the paintings have nothing whatsoever to do with Christmas: they can never be neutralized, nor can they become part of an overall holiday display, no matter how many secular symbols the City erects in the attempt to diminish the religious message of the paintings. See St. Charles, 794 F.2d at 271 (recognizing that "the more sectarian the display, the closer it is to the original targets of the clause, so the more strictly the clause is applied"). To hold otherwise would send a message to Christians that their Saviour's life can be watered down into a secular symbol of the Christmas season, not unlike the 15-foot snowman.
 
 
 135
 The district judge rightly noted that the inquiry into context did not end with an examination of the location and the setting of the display. While the location to some extent, and the setting to a much greater extent, raise constitutional problems, the history of the paintings only strengthens this Court's conclusion that the City endorsed the display. In Allegheny, Justice O'Connor articulated the relevance of the history and ubiquity of a practice to Establishment Clause analysis:
 
 
 136
 Under the endorsement test, the 'history and ubiquity' of a practice is relevant not because it creates an 'artificial exception' from that test. On the contrary, the 'history and ubiquity' of a practice is relevant because it provides part of the context in which a reasonable observer * * * would view such long-standing practices as a disapproval of their particular religious choices.
 
 
 137
 Allegheny, 492 U.S. at 630, 109 S.Ct. at 3121 (O'Connor, J., concurring). This part of the endorsement test draws our attention to the duration of the display. In his review of the dates during which the display remained in the Park, the district judge correctly concluded that the paintings outlasted the Christmas season and all of the secular holiday decorations in the town. By the defendant's own conservative estimates, on two occasions the paintings were still on display in February and in one year they remained on display until the beginning of March. The reasonable observer could still view the paintings, although Christmas itself faded into memory. Even when this Court draws factual inferences in favor of the Jaycees and accepts their admitted approximations for the duration of the display from 1980-1988, we agree with the district judge, who recognized that "in every year since 1980 the paintings were displayed beyond (and in virtually every year, well beyond) any reasonable definition of the 'Christmas season.' " Doe v. Small, 726 F.Supp. 713 at 717 (1939) (emphasis in original). While it is true that in 1988-1989, the duration of the display shortened dramatically, the shorter time period was in response to threatened litigation, and not some recognition by the City that a display of religious paintings for a quarter of a year or more would convey a message of endorsement to observers.
 
 
 138
 The Jaycees contend that this Court should consider only the most recent year of the litigation in applying the endorsement test. However, given the history of the display, that would be inappropriate.[19] Rather, permitting the paintings to remain on display well into March in one year without attempting to cover them or thaw the ground around them only strengthens the plaintiff's argument that the display did not merely acknowledge or celebrate the Christmas holiday season. By remaining on display in March, one wonders why it might not be argued with equal vigor that the paintings were in fact an Easter display, and not a Christmas display. No less than seven of the canvases depict events that concern the trial, crucifixion and resurrection of Jesus, events which are commemorated during Lent and Easter, not Christmas. The duration of the display must be considered in view of its content. With only three out of sixteen paintings relating specifically to Jesus' birth and with all of the paintings remaining on display for up to four months, the message of religious endorsement broadcast by the paintings is undeniable. Along with the other aspects of the context of the paintings in the Park, their history serves only to strengthen this Court's application of the endorsement test to invalidate the display.
 
 
 139
 Moreover, as with other factual issues, the dissent accuses this Court of a failure to view the duration of the display in a light most favorable to the non-moving party. This dispute, like the other contested material facts, does not require a trial. As the Supreme Court recognized in Anderson v. Liberty Lobby, Inc., 477 U.S. 242 at 248, 106 S.Ct. 2505 at 2510, 91 L.Ed.2d 202 (1986), "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." The shorter time period attested to by the Jaycees does not negate the paintings' religious content and the message of endorsement embodied in the context and content of the display. While the advent and duration of the Christmas season can be measured by a calendar, the legality of the Jaycees' display is measured by the Constitution.
 
 
 140
 c. The park as a public forum
 
 
 141
 The Jaycees also argue (and they view this as their strongest point) that their admittedly private religious expression in the Park should receive First Amendment protection under the freedom of speech clause of the First Amendment, since they are a private organization and the Park is a traditional public forum. In arguing that the doctrine of the public forum rescues the City from Establishment Clause analysis, the defendant would have us invent an unprecedented exception to the Establishment Clause.
 
 
 142
 The Jaycees claim that the display is protected speech because it occurs in a public park, drawing attention to Supreme Court decisions upholding free expression in a public forum: "Parks have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). We accept wholeheartedly the assertion that the Park is a public forum. However, identifying a public forum provides merely a starting point for treating the right constitutional questions. It does not relieve a court of its duty to conduct the proper inquiry into a constitutionally suspect practice.
 
 
 143
 The public forum cases decided by the Supreme Court have held that private individuals possess no absolute right to free speech in a public forum. On the contrary, the state may enforce a content-based exclusion of free speech in the presence of "a compelling state interest that is narrowly drawn to achieve that end." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). Quite simply, government has a compelling interest in complying with the constitutional requirement not to violate the Establishment Clause. Widmar v. Vincent, 454 U.S. 263, 271, 102 S.Ct. 269, 275, 70 L.Ed.2d 440 (1981). If a group asserts that particular religious speech in a public forum does not offend the Establishment Clause, it is still obliged to show that the expression satisfies the Lemon and endorsement tests if the challenged practice is to stand. Id.
 
 
 144
 Where private speakers desire access to a public forum, the relevant constitutional inquiry remains the same. Neither the Park's status as a public forum nor the display's sponsorship by the Jaycees, a private organization, resolves the conflict between the Establishment Clause and free speech clause in favor of the defendant. The Supreme Court in Allegheny recognized that "the Establishment Clause does not limit only the religious content of the government's own communications. It also prohibits the government's support and promotion of religious communication by religious organizations." Allegheny, 492 U.S. at 600, 109 S.Ct. at 3105.
 
 
 145
 We have already demonstrated the extent to which the content and context of the display compel a conclusion that the City endorsed religion by permitting the Jaycees to display the paintings, and we have shown the City's failure to articulate a secular purpose sufficient to satisfy the first prong of the Lemon test. The record in this case, therefore, does not permit drawing a bright line between city involvement and private sponsorship.
 
 
 146
 The City has identified itself with the display to so great an extent that the display cannot be viewed as a case of purely private expression in a public forum. For this reason, the public forum analysis as the Jaycees would have us apply it is inappropriate. This Court need not find a compelling interest sufficient to curtail the Jaycees' private expression, because the degree of government involvement and endorsement brings the case squarely within the purview of the Establishment Clause analysis.
 
 
 147
 This Court's recent decision in Crestwood provides no support for the Jaycees' "public forum" argument. Crestwood, applying Establishment Clause analysis, found unconstitutional the village's endorsement and sponsorship of a Roman Catholic mass in a public park during the city's Italian festival. Crestwood, 917 F.2d at 1476. In the decision finding an unconstitutional endorsement of religion, we added the following dicta: "If the Festival * * * is open to private groups that wish to participate, and if [a private group] were the sponsor of the mass, it would be difficult to find an obstacle in the establishment clause of the first amendment." Crestwood, 917 F.2d at 1478.
 
 
 148
 This suggestion rests on two assumptions, neither of which exists in this case. The hypothetical case described in Crestwood posits a policy of equal access, whereby a variety of groups would be welcome to express their views in the public forum. The second part of this statement, that private sponsorship of a religious display would require a different outcome, presumes that sponsorship is wholly private. The facts in this case belie both assumptions, failing to bring the case within the purview of the dicta in Crestwood. As discussed above, there is no explicit or visible policy of equal or open access to the Park. The record shows that the paintings and a flea market are the only regular group uses of the Park. There is no evidence that any other group besides the Jaycees has mounted a religious or any other display with regularity in the Park. Moreover, the sponsorship is not, nor has it ever been, wholly private. The degree of government involvement in endorsing the Jaycees' display blurs the line between private and public, subjecting the paintings to the same fate as the Roman Catholic Mass under the Lemon and endorsement tests.[20]
 
 
 149
 It is worth noting here that this suit was brought pursuant to 42 U.S.C. Sec. 1983, and that doctrine governing liability of private persons under Sec. 1983 provides a useful analogy for understanding why the Jaycees' display violates the Establishment Clause. Private persons can be held liable under Sec. 1983 for deprivation of a constitutional right where the defendant has acted "under color of law." Adickes v. S.H. Kress & Co., 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970); Monroe v. Pape, 365 U.S. 167, 184, 187, 81 S.Ct. 473, 482, 484, 5 L.Ed.2d 492 (1961). Where a private person conspires with a state official to deprive an aggrieved party of constitutional rights by engaging in a prohibited action, Sec. 1983 liability will attach. Adickes, 398 U.S. at 152, 90 S.Ct. at 1605-1606. This is true regardless of whether the police action was authorized officially or lawfully. Id.
 
 
 150
 In this case, public and private conduct cannot be easily separated so that the Jaycees' display evades constitutional scrutiny with the City effectively immunized from its responsibility to adhere to the Establishment Clause. The City's longstanding support of the display, combined with the official authorization contained in the City Council Resolution and the Mayor's statements in favor of the continued display of the paintings, blurs the line between public and private in this case.
 
 
 151
 Because the Supreme Court upheld private religious expression in a public forum in Widmar and more recently in Board of Educ. v. Mergens, 110 S.Ct. at 2356, the Jaycees argue that the analysis upholding expression in those cases mandates a similar outcome in this case. The Jaycees are wrong. These decisions are readily distinguishable on their facts, and in calling our attention to the outcomes the Jaycees avoid the Supreme Court's consistent application of Establishment Clause analysis in both cases. In Widmar and Mergens the Court decided that student religious groups, at a public university and a public school respectively, could use educational facilities for group meetings. In Widmar, the Court applied the Establishment Clause analysis and found that the religious group was but one of a broad class of 100 recognized student groups permitted to use university meeting facilities as part of an "open forum" policy. Widmar, 454 U.S. at 274, 102 S.Ct. at 276. Furthermore, the state university did "not confer any imprimatur of state approval on religious sects or practices" by providing meeting space. Any benefits to the group were incidental, since "a broad spectrum of groups" had access to the school under its open access policy. Id.
 
 
 152
 There is no valid comparison between the university's stated open access policy and the City's endorsement of the paintings. In applying the Establishment Clause analysis from Widmar, the majority noted that "the provision of benefits to so broad a spectrum of groups is an important index of secular effect." Id. Here the paintings are no part of any broad spectrum: they are the only visual display erected with any regularity whatsoever in the Park, and the Jaycees are the only group to use the Park to engage in expression for an extended period of time.[21] Indeed, the record shows that the only other event annually taking place in the Park is a flea market, which is wholly unrelated in time or substance to the paintings.
 
 
 153
 Furthermore, the Widmar Court found no empirical evidence that by allowing the religious group to meet, they would in some way dominate the open forum. Id. at 275, 102 S.Ct. at 277. Here the paintings, taking up a portion of one side of the Park, dominate the public forum during and after the Christmas season. They remained the focus of the display even after the City attempted to neutralize the religious message of the display by installing secular symbols of the holiday season. Considerations specific to open access to a university forum prompted the Supreme Court in Widmar to conclude that the university's policy effected no endorsement of religion. They are not present here, making Widmar an unpersuasive case for the Jaycees.
 
 
 154
 Nor does Mergens provide any additional support for the Jaycees' position. In Mergens, the Court considered the limited question of whether the Equal Access Act, 98 Stat. 1302, 20 U.S.C. Secs. 4071-4074, prevents a high school from denying a student religious group permission to meet on school property during non-instructional time. Mergens, 110 S.Ct. at 2362. The Court held that the school's denial of permission, based on Establishment Clause concerns, violated the students' right to equal access within the meaning of the Act. Id. at 2370.
 
 
 155
 Mergens is distinguishable for several reasons. The case was decided on statutory grounds, and the Court looked to the legislative history of the Equal Access Act and to the findings of Congress that high school students were capable of distinguishing between a school's sponsorship of religious speech and a student-run, student-created religious group. Moreover, the Court echoed its decision in Widmar by stating that the religious club was only one of many different voluntary student organizations permitted to use school facilities, and that there was no empirical evidence that the religious group would dominate the open forum. Mergens, 110 S.Ct. at 2373. In reaching its conclusion, the Court still adhered to the framework of earlier Establishment Clause analysis, but found there would be no message of government endorsement were the school to permit the student religious group to meet.
 
 
 156
 Unlike Mergens, which was essentially a statutory decision, there was no statute in the City of Ottawa explicitly setting forth a policy of equal access to the Park. Rather, the Court has before it only the defendant's assertion that an unwritten equal access policy exists. Therefore, the Court's decision in Mergens adds nothing to Widmar for purposes of this case. Instead it serves to reaffirm this Court's conclusion that neither the municipal policies or practices in Ottawa support a finding that the City had a policy of equal access to the Park.
 
 
 157
 The Jaycees' "public forum" argument suffers from the same defect as their other attempts to remove the display from the scrutiny of the Establishment Clause. The mere existence of a "public forum" does not confer on private speakers an automatic right to free expression. As this Court recognized recently in Lubavitch Chabad House, Inc. v. City of Chicago, 917 F.2d 341 (7th Cir.1990):
 
 
 158
 We are not cognizant of * * * any private constitutional right to erect a structure on public property. If there were, our traditional public forums, such as our public parks, would be cluttered with all manner of structures. Public parks are certainly quintessential public forums where free speech is protected, but the Constitution neither provides, nor has it ever been construed to mandate, that any person or group be allowed to erect structures at will.
 
 
 159
 Lubavitch, 917 F.2d at 347 (emphasis supplied).
 
 
 160
 In Lubavitch, the Court concluded that the City restriction preventing a menorah from being displayed in a public area of the airport was a reasonable time, place or manner restriction on speech under applicable First Amendment jurisprudence considering the display might obstruct the use of the airport or interfere with operations there. Lubavitch, 917 F.2d at 346-347. This recognition has broader application to other cases in which claimed access to a public forum brings constitutional rights into conflict. The essential point is that claims to constitutionally protected access to a public forum do not trump other constitutional provisions. Here the Establishment Clause prohibits the Jaycees from mounting their display in a public park because of the unconstitutional message of governmental endorsement associated with the paintings.[22]
 
 
 161
 The Jaycees' argument in support of a per se rule concerning private speech in a public forum, not unlike the one rejected by the Court in Lubavitch, illustrates the apparent clash between the government's obligation to adhere to the Establishment Clause and a private speaker's right of free expression. Resolving the tension between the two provisions which coexist within the First Amendment does not require us to create a hierarchy of constitutional rights. On the contrary, the Supreme Court has expressly rejected efforts to assign priority to constitutional rights. In Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) the Court, in weighing the First Amendment freedom of expression against a criminal defendant's Sixth Amendment right to a fair trial, declined to favor one amendment over another. Instead, the Court evaluated the extent to which the constitutional rights at stake would be served, concluding that a prior restraint on the press was inappropriate when there were other means available to the trial court to ensure a fair trial. Id. at 569, 96 S.Ct. at 2807-2808.
 
 
 162
 The analogy to cases involving public access to trials is useful here. Like the Supreme Court in Nebraska Press Ass'n, we decline to prioritize constitutional rights and reject the Jaycees' argument that the free speech clause should override the Establishment Clause. Instead, this Court looks to the facts before it and recognizes the degree to which paintings in the Park effect an impermissible endorsement of religion in violation of the Establishment Clause. Our decision imposes a minimal burden on the Jaycees' right to free expression, given the availability of alternative fora for the display.
 
 
 163
 The Second Circuit also recognized that the assertion of a public forum does not permit a private actor to ignore the Establishment Clause. In Kaplan v. City of Burlington, 891 F.2d 1024 (1989), certiorari denied, --- U.S. ----, 110 S.Ct. 2619, 110 L.Ed.2d 640 (1990), the court held unconstitutional the display of a Chanukah menorah in a public park next to city hall and noted that "the existence of a public forum is simply a factor to be taken into account in determining whether the context of the display suggests government endorsement." Id. at 1029. If a reasonable observer, upon viewing a religious display in a public forum, concludes that the display sends a message of government endorsement, then that display is unconstitutional under the Establishment Clause.[23]
 
 
 164
 In a recent decision, the Fourth Circuit, in a case with facts similar to those before this Court, also recognized that private religious speech in a public forum may be restricted if there is an Establishment Clause violation. Smith v. County of Albemarle, 895 F.2d 953 (1990), certiorari denied, --- U.S. ----, 111 S.Ct. 74, 112 L.Ed.2d 48. At issue in Albemarle was the erection of a nativity scene by the local Jaycees on the public lawn in front of the county office building. The Jaycees also claimed in that case that prohibiting the display in a public forum would violate their First Amendment right to freedom of expression. Albemarle, 895 F.2d at 958. However, the Fourth Circuit found that the county had a compelling interest in enforcing a content-based regulation of speech in the local rules governing displays, in order to satisfy the Establishment Clause tests set forth in Lemon and Widmar. Albemarle, 895 F.2d at 959. The county possessed a compelling interest to avoid the unmistakable message of endorsement conveyed by "a prominent religious display in a government setting," thus justifying removal of the Jaycees' nativity scene from the front lawn of the county office building. Id.
 
 
 165
 In reaching this decision, the Fourth Circuit recognized that excluding the creche from public property was necessary and the most narrowly tailored means available to the court to comply with the Constitution. Furthermore, the court recognized that excluding private religious speech from a public forum does not prohibit the Jaycees from exercising their religious beliefs. Id. at 960. On the contrary, the Jaycees there were free to take their display elsewhere. Similarly, there is no question in this case that the Ottawa Jaycees also can move their display to private property. The record reflects that the Jaycees had such an offer to move the paintings onto the property of a local bank and were prepared to move the display, until the City reversed its initial decision to exclude the paintings from the Park and instead provoked a constitutional challenge by the original plaintiff. Removing the display from the Park permits the government to steer the constitutionally required course of neutrality "among religions, and between religion and non-religion." Id., quoting Grand Rapids School Dist. v. Ball, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985).
 
 III. CONCLUSION
 
 166
 The current constitutional tests under the Establishment Clause required us to engage in an extensive review of the Jaycees' display in reaching the conclusion that this exhibition of paintings in Washington Park violates the Establishment Clause. Our decision imposes no content-based restriction on a private person's freedom of expression in a public forum. On the contrary, this Court recognizes that true freedom of religious expression and freedom from governmental establishment of religion are inextricably linked features of our constitutional order: "The First Amendment rests on the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere." Illinois ex rel. McCollum v. Board of Educ., 333 U.S. 203, 212, 68 S.Ct. 461, 465, 92 L.Ed. 649 (1948).
 
 
 167
 In finding there to be an unmistakable message of governmental endorsement under the applicable constitutional tests, this Court in no way condemns the religious beliefs represented by this type of religious display. Indeed, Christians might well take offense at the suggestion that the paintings celebrate only the secular holiday season, or that the paintings' deep religious message could be "neutralized" by the presence of the 15-foot snowman and the "Festival of Lights." The paintings are religious to the core and their history palpably illustrates the depth of City endorsement. The paintings must remain free of City approval or involvement so that Christians may, without governmental approval or involvement, quietly appreciate the paintings according to their own beliefs. In addition, by preventing the government from placing the unmistakable imprimatur of state endorsement upon one religion, we ensure that members of other religious groups and nonadherents will not be made to feel that they are outsiders, that their own spiritual or ethical beliefs are disfavored. In a clear statement of the importance of preserving religious freedom by preventing state endorsement, Justice Stevens wrote for the majority in Wallace v. Jaffree, 472 U.S. at 38, 105 S.Ct. at 2479, that "the individual's freedom to choose his own creed is the counterpart of his right to refrain from accepting the creed established by the majority." Id. at 52, 105 S.Ct. at 2487.
 
 
 168
 The district court's entry of summary judgment for plaintiff is affirmed.
 
 
 169
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 170
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 171
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 172
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 173
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 174
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 175
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 176
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 177
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 178
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 179
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 180
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 181
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 182
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 183
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 184
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLECOFFEY, Circuit Judge, dissenting.
 
 
 185
 We are faced with the issue of whether a private display of religious paintings by the local chapter of Junior Chamber of Commerce in a quintessential public forum, well removed from the seat of government, is protected under the Freedom of Speech Clause or violates the Establishment Clause. In the majority's eagerness to participate in the creation of an absolute wall of separation between church and state, which has never existed (see Doe v. Village of Crestwood, Ill., 917 F.2d 1476, 1481-82 (7th Cir.1990) (Coffey, J., dissenting)), petition for cert. filed, 59 U.S.L.W. 3726 (U.S. Apr. 23, 1991) (No. 90-1573), it has embarked on a journey whose end would exclude any and all religious types of expression from public forums. In its attempt to establish this novel and dangerous precedent, the majority has distorted the defendant's arguments, misapplied the law and construed the facts on appeal from a summary judgment in the light most favorable to Doe, the moving party rather than in the light most favorable to the non-moving party, the Jaycees. The majority, in an action that is unseemly for a federal court, has performed an analysis of the proper theological content of a religious Christmas display and, while denying doing so, prioritized constitutional rights to afford less protection to religious expression in a public forum than to other forms of speech. The majority has failed to come to grips with the fact that this case must be analyzed under free speech and public forum concepts rather than as a religion clause matter, since, as I demonstrate below, it is private speech (the City has no on-going involvement with the display) and not government conduct that is primarily at issue. And the majority's Lemon test analysis essentially raises a red herring by evaluating the Jaycee's conduct rather than the City's conduct.[1] In contrast to the majority's improper approach to this case, we should ask ourselves, "does the Constitution allow the City of Ottawa to exclude the Jaycees' private religious expression from the quintessential public forum of Washington Park?" Under current First Amendment jurisprudence, the answer is "no." Thus, I dissent.
 
 I. FACTS
 
 186
 The majority's selective presentation of the facts as well as the decisions cited in support of its holding requires that I fill in the missing elements to complete the picture. Initially let us establish that Washington Park, located in Ottawa, Illinois, is well removed from the seat of the City government; City Hall is three blocks away, and no buildings acquired or owned by the City of Ottawa are visible from the Park. Deposition testimony from a number of Ottawa residents affirms that Washington Park has always been a quintessential public forum with free and equal access to all for lawful purposes. The Park may be used on a first-come, first-served basis, without requesting permission from the city, and Ottawa currently has no regulations relating to the content of displays, where they may be placed or how long they may remain in place:
 
 
 187
 "Q. So if I wanted to display my pictures depicting worship of the devil tomorrow in Washington Park, I could just go in and put up those displays, is that correct?
 
 
 188
 * * * * * *
 
 
 189
 "The Witness: You can put them up, we might have to have, maybe, the engineer or someone that knows where the wiring is at so you don't get electrocuted, but yes.
 
 
 190
 * * * * * *
 
 
 191
 "Q. And other than checking the wiring in the ground, are there any other limits on installing concrete holes in the park?
 
 
 192
 "A. No.
 
 
 193
 "Q. So I could place these holes anywhere in the park without seeking City of Ottawa's permission, so long as I complied with the wiring in the ground, is that correct?
 
 
 194
 "A. Yes.
 
 
 195
 "Q. And the City Engineer would advise me as to whether or not I was complying with any requirements or concerns with respect to wiring in the ground?
 
 
 196
 "A. Yes."
 
 
 197
 * * * * * *
 
 
 198
 "Q. And I could, in fact, use the Jaycee holes to display paintings depicting devil worship without seeking the permission of the City of Ottawa, is that correct?
 
 
 199
 "A. That's correct.
 
 
 200
 * * * * * *
 
 
 201
 "Q. I could do so without seeking the permission of the Ottawa Jaycees?
 
 
 202
 "A. Yes.
 
 
 203
 "Q. So long as I got there first?
 
 
 204
 "A. Yes."
 
 
 205
 Deposition of City Council Member William C. Ferguson at 44, 86-88.
 
 
 206
 Unrestricted public access to Washington Park dates back some 133 years to the year 1858 when Abraham Lincoln and Steven Douglas made use of the Park for one of their famous debates. In 1988, President Bush likewise chose Washington Park as a forum for a speech and rally during his presidential campaign. According to City records, the Park has been the site of a broad array of private activities in recent years, including religious activities:
 
 
 207
 1982
June 19, 1982 Residents Against Polluted Environment sponsored "Earth Day"
Aug. 2, 1984 Tora! Tora! held a concert for world peace
1983
Oct. 29, 1983 Open air meeting sponsored by the Congregation of the New
 Life Ministry, Inc.
1984
June 28, 1984 Special Church Service
July, 1984 Religious Concert
Aug., 1984 Concert for World Peace
Aug., 1984 Cut a Thon by Cosmetologists
1985
Jan., 1985 Illinois Valley Citizens for Life Prayer Vigil
May, 1985 Concert in Washington Park
June, 1985 United Methodist Church Services
July, 1985 University Women Book Sale
July, 1985 Grade School Band Social and Concert
Oct., 1985 United Way Lunch
1986
June, 1986 Camp Fire Girls Ceremony
June, 1986 Art League Display
June, 1986 Pastor Reed Church Service
July, 1986 Arts & Crafts Show--Art League
July, 1986 A.A.U.W. Book Sale
July, 1986 Decatur Park Concert
Aug., 1986 Grade School Band Concert
Aug., 1986 Flea Market
Aug., 1986 A.A.U. Book Sale
Sept., 1986 Ottawa Lioness Club Flea Market
Sept., 1986 Nam Vets POW/MIA National Recognition Ceremony
1987
May, 1987 Ottawa Retail Council Flea Market
May, 1987 Amazing Grace Fellowship Meeting and Concert
July, 1987 New Lite Ministries Rummage Sale
July, 1987 Nam Vets--Concert
Aug., 1987 Sesquicentennial Celebration Activities
Sept., 1987 Lioness Club Flea Market
Sept., 1987 Nam Vets POW/MIA National Recognition Ceremony
Oct., 1987 All Church Concert
1988
May, 1988 Mayfest Flea Market
July, 1988 Art Show
July, 1988 Book Sale
July, 1988 Dance Show
Aug., 1988 Flea Market
Sept., 1988 Lioness Flea Market
Sept., 1988 POW/MIA National Recognition Ceremony
(Emphasis added.)
 
 
 208
 For many years the City of Ottawa in the spirit of the season and "goodwill toward others" has combined with private parties in a joint effort to decorate the downtown area during the Yuletide season. As part of the City's decorations, it displayed a Santa Claus house in the Park each year during the 1960s and 1970s, but more recently the City displays the house in alternate years. Additionally, the lamp posts in the downtown area as well as those lamp posts in and surrounding Washington Park are garnished with Christmas decorations. In 1988 the City added the "festival of lights" to the Christmas display in Washington Park. The festival of lights included lights, candles, bows, artificial snowflakes and a fifteen foot snowman. The lights were placed on various memorials in the Park as well as on tree branches, including the trees surrounding the paintings at issue in this appeal. The giant candles, bows, snowflakes and the fifteen foot snowman all served as different focal points and were visible from in and around the Park. The Christmas display in the Park also included an evergreen Christmas tree displayed by the Salvation Army that provided its own focal point.
 
 
 209
 The paintings at issue on this appeal occupy less than one-half of the west side of Washington Park in a slightly V-shaped angle (150?), and the vertex of the display is forty-eight feet from the street. Including the area between the paintings and the sidewalk, the paintings occupy 6.34 percent of the Park. The content of the paintings can be discerned only from the west side of the Park, but the City's Christmas display, as distinguished from the J.C.C.'s display, can be viewed from any place in the Park. A 20 1/2" wide by 21" high sign with letters 1 1/16" high, clearly legible from the sidewalk, accompanies the paintings and states: "THIS DISPLAY HAS BEEN ERECTED AND MAINTAINED SOLELY BY THE OTTAWA JAYCEES, A PRIVATE ORGANIZATION, WITHOUT THE USE OF PUBLIC FUNDS." Since 1980 when the Jaycees began displaying the paintings, the display has occupied the west side of Washington Park on an average of two months per year. In 1988, the last year they were displayed, the paintings were up for thirty-five days. The longest period of time that the paintings were displayed was in 1986, when they were displayed for three and one-half months. The Jaycees' explanation for the extended period of time that particular year was that due to the snow and ice, the metal poles were frozen into the metal sleeves in the ground, thus making it impossible to remove the paintings until the thawing season. Except for the years 1964 through 1967, when the city erected the paintings, the paintings have been displayed exclusively by private parties almost every year since the inception of the original display in 1956. Indeed, there is some evidence in the record suggesting that the J.C.C. was the private party who always presented the display except for the span of four years when the City was involved.
 
 
 210
 In November of 1986, Richard Rohrer wrote a letter to the City Council requesting that the paintings be removed from Washington Park because they "represent an unacceptable endorsement of Christianity by the city and violate the constitutional rights of all Ottawans who are not Christians." On December 2, 1986, the Ottawa City Council passed the following resolution:
 
 
 211
 "WHEREAS, for many years, the City of Ottawa has celebrated the Christmas season with many public displays of seasonal decorations throughout the community, and
 
 
 212
 "WHEREAS, the downtown area of the City has, for more than 20 years, been decorated through a coordinated effort of private and public bodies, including the County of LaSalle, City of Ottawa, Ottawa Area Chamber of Commerce, Retail Merchants Association, Ottawa Jaycees and various church and other private groups owning property in or near the downtown area, and
 
 
 213
 "WHEREAS, the decorations have consisted of ornamental lighting on the streets in downtown Ottawa; ornamental lighting, Christmas trees, lighted and festooned trees throughout the downtown area; Santa Claus house on the Courthouse lawn; ornamental lighting, and eighteen large paintings celebrating the Christmas spirit in Washington Park; nativity scenes and other seasonal decorations on private property surrounding Washington Park; ornamental lighting on the Fire and Police station and other decorations in keeping with the season, and
 
 
 214
 "WHEREAS, because of a single complaint filed with it concerning the paintings in Washington Park the City has reviewed the history of the paintings and find that they were initially commissioned by the Retail Merchants Association over 20 years ago as a portrayal of 'The Greatest Story Ever Told' in conjunction with and in commemoration of the spirit of Christmas; that the Retail Merchants Association for many years erected the pictures in Washington Park as part of the Christmas decorations for downtown Ottawa in keeping with the spirit of the season; that in recent years the pictures had been maintained, erected, dismantled and stored by the Ottawa Jaycees as their part in providing appropriate decorations for the community as part of the Christmas season, and
 
 
 215
 "WHEREAS, the City Council of the City of Ottawa finds that the decorations in downtown Ottawa which have been erected for more than the last 20 years by public and private agencies truly represent a cooperative effort by the community to provide appropriate seasonal yuletide spirit so that the people attracted by the Christmas decorations to shop and otherwise do their business in the downtown area will be benefitted by the traditional, beautiful and seasonally appropriate decorations which they have come to know and love for 2 decades. The City Council specifically finds the pictures erected by the Jaycees in Washington Park are an integral part of the seasonal decorations epitomizing Christmas in the hearts and minds of the citizens of the City.
 
 
 216
 "NOW, THEREFORE, BE IT RESOLVED by the City Council of the City of Ottawa, that after due consideration and reflection upon the complaint raised concerning the pictures in Washington Park, that this council endorse the activities of the Ottawa Jaycees in maintaining, erecting, dismantling and storing said pictures and incorporating them in the overall Christmas display that annually graces the downtown area of the City and further thanks all the other groups, public and private, who also maintain, erect, dismantle and store other portions of the Christmas decorations which are integral to the annual yuletide season and the spirit thereof."
 
 
 217
 Subsequent to this resolution the J.C.C., at its own expense, replaced the original supports for the paintings with new concrete supports containing metal sleeves which would allow the paintings to be erected and removed with little expenditure of labor. The Jaycees designed the new supports and installed them in locations approved by the City Engineer and City Commissioner of Public Improvement (the mayor testified that any installation of a concrete foundation must be approved by the City Engineer to avoid cutting electric or water lines). Richard Rohrer filed a complaint seeking to enjoin the display of the paintings August 11, 1988; he modified his complaint January 11, 1989 to request an injunction absent restrictions on the frequency and duration of the display; and the complaint was once more amended on June 12, 1989 to substitute Jane Doe as plaintiff after Rohrer moved from Ottawa.
 
 II. DISCUSSION
 
 218
 Contrary to well-established law, the district court and (to a lesser extent) the majority have for some reason unexplained viewed the record and the inferences to be drawn from it in the light most favorable to the plaintiff. In granting summary judgment as well as on an appeal from the district court's entry of summary judgment, such preferential and improper treatment of the moving party is clearly erroneous as a matter of law. "In reviewing a grant of summary judgment, we must view the record and all inferences drawn therefrom in the light most favorable to the party opposing the motion. See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)." Beard v. Whitley County, REMC, 840 F.2d 405, 409 (7th Cir.1988). When the record and appropriate inferences drawn from it are construed in the light most favorable to the Jaycees as required in a motion for summary judgment, it is clear that the J.C.C.'s display of the paintings in Washington Park passes constitutional muster because the display constitutes private religious speech in an open public forum; hence, it is protected under the Free Speech Clause and cannot violate the Establishment Clause of the United States' Constitution. Even if we were to view the facts from the majority's perspective, which allows them to achieve their desired result by cleverly transforming this private display into a public one and denying that Washington Park is an open public forum, the paintings would still pass constitutional muster under County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989).
 
 
 219
 A. Private Religious Speech in a Public Forum
 
 
 220
 Throughout the pleadings the J.C.C. emphatically asserts that the paintings are a private display entitled to First Amendment protection. Its contention is that since the City provides no support for the display and has no involvement other than to allow the Jaycees to use the space in the Park as it has allowed many a person all the way back to Lincoln and Douglas in their debate of 1858, the display may not be viewed as public speech. Yet the majority somehow construes the record as demonstrating that "[t]he City has identified itself with the display to so great an extent that the display cannot be viewed as a case of purely private expression in a public forum." Maj.Op. at 770. The majority makes this conclusory statement while failing to delineate with specificity how the City has identified itself with the display. When the extent of the City's involvement with the display is compiled, it is obvious that the City's actions fail to convert the Jaycees' private speech into governmental speech.[2] The totality of what the majority apparently views as the City's involvement is as follows:
 
 
 221
 1) In 1980 an article in an Ottawa newspaper reported that a City official had discovered the paintings in storage and that the mayor "hoped to find a private group willing to display the paintings...." Maj.Op. at 748.
 
 
 222
 2) In 1986 the City Counsel passed a resolution refusing to censor the Jaycees' display by banning it from Washington Park.
 
 
 223
 3) In 1986 the City Counsel allowed the J.C.C., at the Jaycees' expense, to replace the original, wornout supports for the paintings with new supports constructed according to a better design and installed at a different angle.
 
 
 224
 4) The City engineer met with the Jaycees in the Park to make certain that the new supports did not interfere with electrical or water lines.
 
 
 225
 5) In 1988 when the City Counsel decided to ban the display in response to the initiation of this law suit, the mayor expressed his personal appreciation of the paintings.
 
 
 226
 6) In 1988 the City instituted the "festival of lights" in Washington Park.
 
 
 227
 Initially, it is important to note that the mayor did not say that "he hoped to find a private group willing to display the paintings." Maj.Op. at 748. The entirety of the reference to the mayor in the article the majority references follows:
 
 
 228
 "Mayor Jim Thomas said the city will pay the electrical bill for illuminating the paintings and help 'in any way we can,' except financially, if a group wants to display them again.
 
 
 229
 " 'These pictures would be very, very costly today to duplicate,' he said. 'They were considered quite expensive even at that time.' "[3]
 
 
 230
 The record is void of any evidence that the City took action to find a private sponsor for the display (or that the City has helped the Jaycees in any way other than allowing them to display the paintings). The City Parks Superintendent who discovered them in an old grandstand stated:
 
 
 231
 " 'We've got to find a home for them, got to find an owner,' he said. 'This building will be torn down early next spring, and the city doesn't have another place big enough to store them.' "
 
 
 232
 Upon reading about the discovery of the paintings, the Jaycees contacted the City and volunteered to display the paintings; the Jaycees have been the caretakers of the paintings since that time. Since the City was forced to "find a home" for [the paintings] as a result of the old grandstand being "torn down," there is little else the City could have done short of destroying them. Thus, stating that the City would "help 'in any way we can,' except financially, if a group wants to display them again" is more indicative of a desire to preserve a work of art than to "identify" the City with the message of the paintings.
 
 
 233
 Secondly, the majority somehow conjures up City "identification" with the paintings in the City Counsel resolution refusing to censor the display. In view of the fact that the issue arose only because of a request to ban the display from the Park, passing a resolution to allow the paintings to remain is far from City involvement with them. As I shall establish below, the resolution was not only neutral, it also expressed a legitimate secular purpose, that of helping to attract business to the downtown area through allowing the Jaycees to continue financing and managing the paintings' display. Third, in regard to the installation of new supports, the majority fails to mention that there were existing, worn-out supports in the ground, and their dilapidated state caused problems in the erection of and dismantling of the paintings yearly. In fact, weather conditions combined with the condition of the old supports allowed the paintings to freeze in place in 1986, resulting in the display remaining in the Park for an extended period of time. Thus, the old supports were in need of replacement, and the City Counsel's mere permission allowing a private party to replace them fails to constitute City sponsorship or support for the display any more than the City's granting a private party an easement or variance over public property implies endorsement of the party's project. This is especially so in view of City Counsel member Ferguson's testimony that other parties are free to use the Jaycees' supports or to install their own. Fourth, the majority apparently finds City "identification" because the City engineer advised the Jaycees where they could install the supports. In view of the testimony from Ferguson as well as Mayor Small that the City engineer would need to approve the location of any holes in the Park for the sake of avoiding damage to underground electric lines (or possible fire and explosion), the engineer's meeting with the Jaycees in the Park fails to demonstrate a nexus between Ottawa and the display. Indeed, the City engineer's approval of the placement of the supports, according to uncontroverted testimony in the record, is the equivalent of a "diggers' hotline" service provided in many cities to protect the contractor (diggers) and others from injury (e.g. from electrical shock and explosions) and to prevent the interruption of service to other customers (through damage to underground gas, electric, water or telephone lines).
 
 
 234
 Fifth, the majority seems to perceive City "identification" with the paintings through statements from Mayor Small that demonstrate his personal appreciation of the display. How can a public official's complimentary remarks concerning a private display of art transform the display into governmental speech? Significantly, the mayor never went on record as stating that the paintings reflected his, much less the municipality's, religious beliefs. Since the paintings are a work of art with value independent of their religious message, the mayor's appreciation may well be in reference to the aesthetic quality of the paintings rather than their message. Can we violate the Constitution by expressing our aesthetic approval of a piece of art? I think not. Finally, the majority's statement that the City added the "festival of lights" "[i]n the hope of vindicating their legal position vis-a-vis the display" is sheer speculation and in contradiction of the record. A news article in Doe's exhibits demonstrates that the "festival of lights" was initiated in order to replace the decoration provided by the paintings:
 
 
 235
 "While Ottawa reluctantly decided to ban the 16 paintings of Jesus displayed in Washington Park, the City Council Tuesday turned to another way to decorate the park for Christmas.
 
 
 236
 "James Bruehler, president of the Ottawa Area Chamber of Commerce and Industry, discussed adding lights and decorations to the park. The city is considering spending $3,500 of the estimated $9,600 cost."
 
 
 237
 Ottawa Daily Times, Oct. 19, 1988 (emphasis added). Thus, the addition of the "festival of lights" to the Christmas decorations in the Park is unrelated to a City attempt to justify allowing the paintings to remain in the Park, and it fails to establish a connection between the City and the Jaycees' display.
 
 
 238
 Even viewing the evidence referred to and inferences therefrom objectively (rather than in the light most favorable to the Jaycees), the majority's conclusion that the paintings "cannot be viewed as a case of purely private expression in a public forum" is clearly erroneous. The majority, even in its convoluted effort to uphold the district court through viewing the record in the light most favorable to Doe, has failed to demonstrate that the Jaycees' display is anything other than what the Jaycees assert, private speech. The question thus becomes whether private religious speech in a quintessential public forum is entitled to the same degree of protection as other private speech in public forums.
 
 
 239
 Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) is the appropriate starting point for an analysis of private speech in a quintessential public forum:
 
 
 240
 "In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939). In these quintessential public forums, the government may not prohibit all communicative activity. For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. Carey v. Brown, 447 U.S. 455, 461, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980)."
 
 
 241
 Id., 460 U.S. at 45, 103 S.Ct. at 954-55. The Supreme Court has not as of this date directly addressed the question of private religious speech in a "quintessential public forum." In Allegheny, a case the majority considers to be factually similar to this one, the Court specifically noted that it was not addressing the kind of public forum issue we have before us. Indeed, the Supreme Court cited McCreary v. Stone, 739 F.2d 716 (2nd Cir.1984), aff'd by an equally divided court, sub nom. Board of Trustees of Scarsdale v. McCreary, 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985), as an example of a case addressing private religious speech in a public forum: "the creche here does not raise the kind of 'public forum' issue presented by the creche in McCreary v. Stone." Allegheny, 109 S.Ct. at 3104 n. 50. Thus, in order for the J.C.C.'s display located in a public forum to be analyzed properly, it must be viewed like the creche located in a public forum in McCreary, precedent which the majority casts aside and fails to acknowledge, rather than the creche positioned on the Grand Stairway entering the County Courthouse in Allegheny.
 
 
 242
 In McCreary, a Village in New York refused to grant a private organization permission to place a creche in a public park, which the district court found to be a public forum because "the Village has never shown an inclination to legally establish or even describe [the park] as anything other than a park of the kind that is traditionally dedicated to First Amendment activities...." McCreary v. Stone, 575 F.Supp. 1112, 1123 (S.D.N.Y.1983). The Second Circuit stated that the issue before it was "whether the Village's content-based denials of the applications to display a creche for a period of approximately two weeks during the Christmas holiday season at Boniface Circle, a traditional public forum, were necessary in order to serve the compelling state interest of avoiding contravention of the Establishment Clause of the First Amendment." 739 F.2d at 723. The district court had decided that the content-based exclusion was proper through distinguishing Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), but the Circuit Court disagreed. McCreary, 739 F.2d at 723. Relying on Widmar as well as Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), the Second Circuit reversed and remanded "for the entry of an injunction prohibiting the Village from relying on the Establishment Clause as a reason for prohibiting the erection of a creche [in the] traditional public forum, for a period of approximately two weeks during the Christmas holiday season...." McCreary, 739 F.2d at 730. The Second Circuit clearly recognized that the government, including the courts, may not exclude religious expression from open public forums. In contrast to McCreary, the trial court held that the "City Defendants may--and must--regulate religious speech in Washington Park, including that of the Jaycees, if such speech presents the danger of a violation of the Establishment Clause." Doe v. Small, 726 F.Supp. 713, 724 (N.D.Ill.1989) (emphasis added). This unusual and legally insupportable proposition of law--that the government must regulate (and apparently ban) private religious speech in a public forum if there is a possibility of an Establishment Clause question--cannot be valid if McCreary is still good law, which is evident from the nation's highest Court's reference to it in Allegheny. The trial court relied on Allegheny 's statement that the Constitution "prohibits the government's support and promotion of religious communications," id. (quoting Allegheny, 109 S.Ct. at 3105), for its proposition, but the Allegheny quotation merely prohibits government endorsement of a message; its language is loud and clear that it does not now, nor has it ever, mandated government regulation of private religious speech.
 
 
 243
 It is well established that private religious speech is protected under the Free Speech Clause of the First Amendment. "[R]eligious worship and discussion ... are forms of speech and association protected by the First Amendment. See, e.g., Heffron v. International Soc. for Krishna Consciousness, Inc., 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951); Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948)." Widmar v. Vincent, 454 U.S. at 269, 102 S.Ct. at 274 (footnote omitted). The Supreme Court has to date not been asked to address the question of whether the Establishment Clause or the Free Speech Clause would prevail if the two were in conflict, see id. at 273 n. 13, 102 S.Ct. at 276 n. 13, but there is little reason to believe that the two clauses could be in conflict. As Justice O'Connor writing for the Court, noted last year, "there is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." Board of Educ. of Westside Community Schools v. Mergens, --- U.S. ----, 110 S.Ct. 2356, 2372, 110 L.Ed.2d 191 (1990) (emphasis original). When there is an Establishment Clause violation, there must either be a governmental expression involved or a governmental policy benefitting, endorsing or entangling the government with the religious message of a private speaker. See Allegheny, 492 U.S. 573, 109 S.Ct. 3086 (County allowed a private display of creche at seat of government in area not normally open to private structures); Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (Ten Commandments on classroom walls constituted government speech); Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (State support of religious schools caused excessive entanglement between state and religion); American Jewish Congress v. Chicago, 827 F.2d 120 (7th Cir.1987) (Creche in seat of government implied city endorsement of message); American Civil Liberties Union v. City of St. Charles, 794 F.2d 265 (7th Cir.1986) (Cross on fire station was government speech). Private religious speech itself in a quintessential public forum does not and cannot violate the Establishment Clause, since it limits the government alone, and thus an analysis of private religious speech under traditional Establishment Clause analysis is inappropriate.
 
 
 244
 The majority improperly applies the Lemon test to private religious speech in a public forum in order to justify its rejection of the J.C.C.'s public forum argument. The majority follows the erroneous rational of the district court in making the novel and analytically deficient assertion that "[i]f a group asserts that particular religious speech in a public forum does not offend the Establishment Clause, it is still obliged to show that the expression satisfies the Lemon and endorsement tests if the challenged practice is to stand." Maj.Op. at 770 (emphasis added). This proposition imposes a novel and suspect burden on private speech. Since when does a private party bear the burden of proving that his or her speech or actions are constitutional? As I understand the law, I had always thought that the party striving to restrict private speech bore the burden of proving that such limitations were justified. Moreover, the majority's reliance on Widmar for this proposition is misplaced. In Widmar, the Supreme Court noted that it is the government policy involved that must past the Lemon test. Widmar, 454 U.S. at 271, 102 S.Ct. at 275.[4] (Here the government policy is to follow the constitutional mandate of allowing equal access to its public forums.) Moreover, a practice
 
 
 245
 "is not unconstitutional simply because it allows churches to advance religion, which is their very purpose. For a [practice] to have forbidden 'effects' under Lemon, it must be fair to say that the government itself has advanced religion through its own activities and influence. As the Court observed in Walz, 'for the men who wrote the Religion Clauses of the First Amendment the "establishment" of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity.' 397 U.S., at 668, 90 S.Ct. at 1411."
 
 
 246
 Corporation of Presiding Bishop v. Amos, 483 U.S. 327, 337, 107 S.Ct. 2862, 2869, 97 L.Ed.2d 273 (1987) (emphasis original). The majority has clearly erred in applying the Lemon test to private speech rather than government action. It is inconceivable under the clear mandate of existing Supreme Court case law that private religious speech in a public forum must pass the Lemon test, for nearly all private religious expression has the purpose of promoting some religious belief or practice. If the Lemon test were applicable to private religious speech in a public forum, all religious speech would have to be excluded from public forums.
 
 
 247
 The majority's orchestrated confusion on the application of the Lemon test is evident throughout its opinion in its conflation of the Jaycees' practice of exhibiting the paintings with the City policy allowing the display as well as in its consistent references to the unconstitutional purpose of the paintings and even to the "Jaycees' unconstitutional purpose." Maj.Op. at 759. How can a private party's purpose be unconstitutional? State action is the sine qua non of a First Amendment violation, and the J.C.C. is acting for and on behalf of itself, a privately sponsored group, not for the City or any governmental agency. A private party may certainly request governmental action, but neither the request nor the party's motive (or "purpose") necessarily implicates the Constitution. The majority further states that "it is beyond dispute that endorsement of religion was the reason for the display," id. at 760, as if a private group is not entitled to endorse whatever religion they deem proper, if any. Of course the Jaycees intended to endorse the message of the paintings, which they view as conveying the true meaning of Christmas.[5] They have a constitutionally protected right to endorse religion in a public forum as long as they do not violate a reasonable time, place or manner regulation.
 
 
 248
 Because of the majority's misapplication of the Lemon test, it assumes that the Jaycees' rights under the Free Speech Clause are in conflict with the Establishment Clause.[6] Id. at 770. Then while disavowing that it is prioritizing constitutional rights, the majority places what it considers "a minimal burden on the Jaycees' right to free expression" in order to avoid an imagined violation of the Establishment Clause without explaining how the Establishment Clause has priority over the Free Speech Clause. As demonstrated above, the Jaycees' display of the paintings does not violate the Establishment Clause because the display is nothing more than private speech in a public forum. Rather, the federal court's action in enjoining the display of the Jaycees is in violation of the Free Speech Clause and in my humble opinion is beyond any legitimate exercise of the power of our federal justice system. The court must find an unconstitutional policy or practice of a governmental entity, in this instance the City, in order for it to be able to justify the issuing of an injunction, and when and if an unconstitutional policy or practice of the government is found to exist, the injunction must be directed toward that specific policy or practice.
 
 
 249
 In the instant case, the district judge found the Jaycees' display to be unconstitutional, and directed his injunction against the City: "Jaycees' display ... doubly violates the Establishment Clause ... City is therefore ordered to have the paintings removed...." Doe v. Small, 726 F.Supp. at 724-25. While the district court had jurisdiction under the Establishment Clause of the First Amendment to determine whether the City policy was constitutional and to enjoin unconstitutional governmental policies or conduct, the court was without jurisdiction to determine the constitutionality of private speech, as there is no constitutional limitation on private speech. Since private speech in and of itself cannot violate the First Amendment, the Constitution affords no basis of jurisdiction for evaluating private speech. Thus, the district court, and this Court, are without jurisdiction to decide that the Jaycees' display passes or fails the Lemon test. Indeed, the plaintiff's pleadings on file with the court do not request absolute exclusion of the paintings from Washington Park. The plaintiff's second amended complaint requested the court to "[e]nter a permanent injunction prohibiting defendants from allowing the display of the paintings in Washington Park without [any] limits on the frequency and duration of such display sufficient to avoid violation of the Establishment Clause of the First Amendment to the United States Constitution...." (Emphasis added). If the plaintiff has suffered a constitutional injury, which I do not concede, it can only be grounded on the lack of regulation from the City. I know of no precedent that justifies mandating regulation of public forums, but if there were, the district court, pursuant to the remedy requested, should have only required the City to draft proposed regulations.
 
 
 250
 It is clear that the district court based its decision on the same twisted application of the Lemon test to private speech that the majority propounds, thus concluding that "it makes no difference to the analysis or result that Washington Park may be a public forum." Doe v. Small, 726 F.Supp. at 724. The district judge repeatedly demonstrates and repeats his analytical error in referring to the unconstitutional purpose and effect of the paintings. After quoting the Lemon formula, he states, "[i]f the challenged display violates any one of those criteria, the display is unconstitutional.... Here plaintiff urges the paintings run afoul of not just one but each of the first two prongs." Id. at 719 (emphasis added and emphasis in original). The court for reasons unknown failed to distinguish between a governmental display, Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), a private display in the seat of government, Allegheny, 492 U.S. 573, 109 S.Ct. 3086, American Jewish Congress v. Chicago, 827 F.2d 120 (7th Cir.1987), and a private display in a public forum, McCreary v. Stone, 739 F.2d 716 (2d Cir.1984). I repeat that in the latter, the governmental policy alone is subject to the Lemon analysis. In the trial court's analysis, however, "[o]nly one reasonable inference flows from City's decision to allow this blatantly religious display on public property instead of other more secular displays: City intended to promote that religious message, for no secular message may fairly be attributed to the display in its totality." Doe v. Small, 726 F.Supp. at 721 (emphasis added).[7] The district judge then crafted the misapplication of the Lemon test to the private display in concluding that "[b]ecause the sole purpose behind the display of the intensely religious paintings was to promote the religious message, City Defendants violated the Establishment Clause by allowing the Jaycees to construct and maintain the paintings in the Park." Id. at 722 (emphasis added). The trial judge then went on to state that even if the purpose were proper (he vacillates between speaking of the purpose of the Jaycees and the purpose of the City without distinguishing between them), "the display would still be clearly unconstitutional because its overall effect is obviously to endorse the Christian religion." Id. (emphasis added). And again the court states, "[i]t cannot be gainsaid that the primary effect of the currently challenged paintings is clearly to endorse the Christian religion." Id. at 723 (emphasis added). So what? The purpose and effect of a private party's religious speech in an unlimited public forum does not affect the question of whether the government has violated the Establishment Clause. Yet the district judge's reliance on the application of the Lemon test to the Jaycees for his holding is made clear in the following:
 
 
 251
 "Because Jaycees' display of paintings depicting the life of Jesus in the park has both the primary purpose and primary effect of endorsing an overtly religious message, the display doubly violates the Establishment Clause of the First Amendment to the Constitution. This Court has been advised that the paintings have already been put up on display for the current season. City is therefore ordered to have the paintings removed by December 8, 1989 and to forego any future display of the paintings in the Park by any group."
 
 
 252
 Id. at 724-25 (emphasis added) (footnotes omitted). I fail to understand how private speech in a public forum far removed from the seat of government could be declared unconstitutional. This misapplication of the Lemon test to private religious speech in a public forum is without precedent and must not be allowed to stand.
 
 
 253
 Despite the district court's and the majority's rather cavalier dismissal of the relevance of the public forum to this case, the fact that Washington Park is a public forum is the decisive factor. There is ample support in Supreme Court jurisprudence for the proposition that any regulation of speech in a public forum must allow for equal access to religious speech in order to pass constitutional muster. Indeed, subsequent events in the history of the Menorah at issue in Allegheny clearly demonstrates the constitutional mandate of equal access for religious speech:
 
 
 254
 "In 1989, following the Allegheny County decision, the City of Pittsburgh rejected a request to place the Menorah again, and suit was brought in an attempt to force the City to do so, under the traditional doctrine that if a use is permissible in a public forum, it is unconstitutional discrimination and deprivation of first amendment rights to deny use based on the message conveyed, or on any grounds other than generally applicable regulations of time, place, and manner of use. The following sequence of decisions then resulted.
 
 
 255
 "The district court granted an injunction requiring the City to allow the placement, on public forum grounds. Chabad v. City of Pittsburgh, CA No. 89-2432 (W.D.Pa. Dec. 21, 1989).
 
 
 256
 "The Third Circuit stayed that order. No. 89-3793 (3rd Cir. Dec. 21, 1989).
 
 
 257
 "Justice Brennan vacated the order of the Third Circuit, leaving in effect the order requiring the city to allow the placement. 58 U.S.L.W. 3426 (Dec. 22, 1989).
 
 
 258
 "The Supreme Court, three justices dissenting, declined to vacate the stay granted by Justice Brennan. [---] U.S. [----], 110 S.Ct. 708 [107 L.Ed.2d 729] (Dec. 29, 1989).
 
 
 259
 "Thus, although there was no clear statement of law or reasoning in any of the decisions, all of which were rendered within one week, start to finish, the ultimate result was that a city was forced to allow the display of a nearly-naked menorah on the grounds that it was being placed in a traditional public forum and contained appropriate and sufficient disclaimers."
 
 
 260
 Americans United for Separation of Church and State v. City of Grand Rapids, 922 F.2d 303, 308-09 (6th Cir.1990). The above series of events, resulting in the City of Pittsburgh being required to allow the placement of a Menorah in a public forum, highlights the inappropriateness of analyzing private religious speech under the Establishment Clause as opposed to the free speech and public forum doctrines. Additionally, it illustrates the district court's and the majority's error in excluding the J.C.C.'s religious expression from a public forum.
 
 
 261
 In both Widmar, 454 U.S. at 270-76, 102 S.Ct. at 275-78, and Mergens, 110 S.Ct. at 2370-73, the Supreme Court rejected the argument that the Establishment Clause should bar the use of limited public forums by religious groups. Nonetheless, the district court and the majority rely on Widmar for the proposition that the "government has a compelling interest in complying with the constitutional requirement not to violate the Establishment Clause." Maj.Op. at 770; see Doe v. Small, 726 F.Supp. at 724. The Widmar Court did state that "the interest of the University in complying with its constitutional obligations may be characterized as compelling." Widmar, 454 U.S. at 271, 102 S.Ct. at 275 (emphasis added). However, the Supreme Court refused to hold that allowing equal access to the limited public forum at issue in Widmar would violate the Establishment Clause. The Establishment Clause concerns were insufficient to justify a content-based exclusion of religious speech from a forum open to all other student groups.
 
 
 262
 Moreover, in Mergens the Supreme Court, citing Widmar, stated that a policy of equal access to religious speech, even in a limited public forum, is constitutionally mandated:
 
 
 263
 "The message [sent by equal access] is one of neutrality rather than endorsement; if a State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion. 'The Establishment Clause does not license government to treat religion and those who teach or practice it, simply by virtue of their status as such, as subversive of American ideals and therefore subject to unique disabilities.' "
 
 
 264
 Mergens, 110 S.Ct. at 2371 (citation omitted) (emphasis added). The district court's absolute ban on exhibiting the paintings in Washington Park is a clear demonstration of such "hostility toward religion" because the Park is open to all other legal activities. I am convinced that there is a stronger policy for equal access in an open public forum such as Washington Park than in a limited one like Widmar (university facilities) or Mergens (high school facilities). But the majority, in an unconvincing attempt to distinguish Mergens, writes it off as a case where "the Court considered the limited question of whether the Equal Access Act ... prevents a high school from denying a student religious group permission to meet on school property during non-instructional time.... The case was decided on statutory grounds...." Maj.Op. at 772. The majority has once again misstated the case at issue by ignoring the constitutional challenge to the Equal Access Act in Mergens. It is true that one section of the Mergens opinion did deal with the interpretation of the Equal Access Act, but the other section of the opinion affirmed the constitutionality of the Act in the face of a claim that allowing equal access to religious groups violated the Establishment Clause. The Supreme Court stated that "[t]he proposition that schools do not endorse everything they fail to censor is not complicated." Mergens, 110 S.Ct. at 2372. The same proposition holds true for local governments; in fact, a high school may constitutionally censor speech in the forums it creates, see Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988); Bethel School Dist. v. Fraser, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), but a governmental entity may never censor speech (especially private speech) in a public forum absent a compelling state interest. The Supreme Court did not find that the Establishment Clause provided a compelling state interest even in the limited forum where speech may be censored in Mergens. If the Establishment Clause fails to provide a compelling state interest in a limited public forum, I fail to comprehend how it can constitute a compelling state interest in an unlimited public forum. The majority and the district court attempt to distinguish Widmar in the same manner as the trial court in McCreary (see McCreary v. Stone, 575 F.Supp. at 1132), by finding that the challenged display was the only display frequently erected in the park. The Second Circuit found the fact that the park was available to all groups, even if not used by them, an important factor. McCreary, 739 F.2d at 727. The novel idea that regular use of a public forum by only one private party implies government endorsement is without support either in law or logic. Furthermore, the majority's assertion that the paintings "are the only visual display erected with any regularity whatsoever in the Park, and the Jaycees are the only group to use the Park to engage in expression for an extended period of time," Maj.Op. at 772, is another misstatement of the record. It is undisputed that the World War Association of Ottawa erected a permanent War Memorial in 1984. I would think a permanent War Memorial certainly must be viewed as a visual display that expresses a viewpoint for an extended period of time, but the majority brushes the significance of the Memorial aside with a notation that "it has no religious connotations." Id. at n. 21. The lack of "religious connotations" is immaterial to the issue of whether the Memorial is a means of "engag[ing] in expression for an extended period of time." In addition to the permanent War Memorial, a Santa Claus house was displayed yearly during the 1960s and 1970s (currently in alternating years), the lamp posts in the Park traditionally have been decorated for Christmas, and now, with the "festival of lights," there is an additional yearly visual display.
 
 
 265
 In a further attempt to distinguish Widmar, the majority states that "the Widmar Court found no empirical evidence that by allowing the religious group to meet, they would in some way dominate the open forum. Here the paintings, taking up a portion of one side of the Park, dominate the public forum during and after the Christmas season." Maj.Op. at 772. The majority's distinction is fundamentally flawed in that it overlooks the reason the forum in Widmar (as well as the forum in Mergens ) was deemed public--the forum was a governmentally created limited public forum precisely because of the broad spectrum of groups using it; in contrast, a public park is a quintessential public forum by its very nature. The Supreme Court's passing mention of a possible concern over religion dominating a limited public forum created by the government in Widmar falls far short of raising a concern over religion dominating a quintessential public forum. There is no precedent for excluding religious speech from an unlimited public forum merely because no one else uses the forum as much. Moreover, it seems to me that a permanent war memorial makes use of the Park to a greater extent than a once-a-year Christmas display. Hence, it is evident that the equal access mandate of Widmar is more binding on this case than the majority is willing to admit.
 
 
 266
 In attempting to avoid and cast asunder the equal access mandate of Mergens and Widmar, the majority somehow without support in the record comes to the conclusion "that neither the municipal policies or practices in Ottawa support a finding that the City had a policy of equal access to the Park." Maj.Op. at 772.[8] I find this conclusion astounding and unconvincing in light of the record here. City council members testified that the City has no restrictions on the use of Washington Park. Moreover, the record clearly demonstrates an abundant usage of the park in long past (1858), as well as recent history (see supra pp. 793-794). Yet the majority bases its statement on the fact that "there was no statute in the City of Ottawa explicitly setting forth a policy of equal access to the Park. Rather, the Court has before it only the defendant's assertion that an unwritten equal access policy exists." Id. at 772. The majority's conclusion stands the law on its head with the newly created legal theory premised on a foundation of quicksand of imposing a burden on defendants in constitutional suits of proving that they have not violated the Constitution. I would have thought it is beyond dispute that the burden of proving a violation of the Establishment Clause is on the party alleging the violation, the plaintiff. But the record is devoid of any evidence of the City not allowing equal access to all in Washington Park; in fact, in this dissent I have identified some thirty-plus private groups who have made use of the Park (see pages 793-794) for organized events in recent years. I am convinced beyond the shadow of a doubt that if the evidence in the record established that the City allowed the Jaycees to have access to the Park and denied access to others, the plaintiff most certainly would have brought that evidence to the court's attention. In the absence of a specific allegation to the contrary, the City is entitled to a presumption that it followed the constitutional mandate of allowing equal access to Washington Park. Moreover, the record is clear (see id.) that Washington Park has traditionally been open to a broad array of private activities, religious and non-religious, alike. The majority has failed to cite any authority for the proposition that a public park will be deemed a quintessential public forum only if there is a written policy to that effect. The government is under a constitutional mandate to allow equal access to all public forums, and it may be enjoined from discriminating against any party. How then, in the absence of evidence of any person or group being excluded from the Park, can the majority conclude that there is no equal access policy? The majority argues that "[t]he existence of an equal access is clearly an ultimate question, a constitutional fact that requires this Court to review the record de novo. As such, this Court is under no obligation to draw inferences favorable to the non-moving party." Maj.Op. at 761. While the majority is correct in stating that we review "constitutional facts" de novo, that fails to justify shifting the burden of proving a constitutional policy to the defendants. The burden of proving that the City does not allow equal access to Washington Park was on Doe, and she has failed to meet that burden. Like the district court in McCreary v. Stone, we should hold that Washington Park is an open public forum because "the [City] has never shown an inclination to legally establish or even describe [the Park] as anything other than a park of the kind that is traditionally dedicated to First Amendment activities...." 575 F.Supp. at 1123.
 
 
 267
 The majority also justifies its rejection of the Jaycees' public forum argument by holding that
 
 
 268
 "[t]he City has identified itself with the display to so great an extent that the display cannot be viewed as a case of purely private expression in a public forum. For this reason, the public forum analysis as the Jaycees would have us apply it is inappropriate. This court need not find a compelling interest sufficient to curtail the Jaycees' private expression, because the degree of government involvement and endorsement brings the case squarely within the purview of the Establishment Clause analysis."
 
 
 269
 Maj.Op. at 770.[9] The majority then mis-characterizes the most recent Establishment Clause cases from this Court. It makes a clever, but ineffective, attempt to distinguish the Jaycees' exhibit from this Court's very clear and unambiguous language in Doe v. Village of Crestwood, 917 F.2d 1476 (7th Cir.1990), that supports the Jaycees' public forum argument on the basis of the assumptions (which are invalid whether viewing the record in the light most favorable to the Jaycees or Doe) that the City is a sponsor of the display and the Park is closed to other groups.[10] In Crestwood, the Court said that
 
 
 270
 "[t]he Park is a public forum. If the Festival, too, is open to private groups that wish to participate, and if the Crestwood Women's Club (or a church) were the sponsor of the mass, it would be difficult to find an obstacle in the Establishment Clause of the First Amendment.... A government may not close its public forums to religious practice by private parties. Widmar v. Vincent, 454 U.S. 263 [102 S.Ct. 269, 70 L.Ed.2d 440] (1981); Fowler v. Rhode Island, 345 U.S. 67 [73 S.Ct. 526, 97 L.Ed. 828] (1953). Although the holding of the mass in a public park creates a possibility that some members of the public will assume sponsorship (as opposed to acquiescence) by the polity, the government's obligation not to discriminate against religious speech in circumstances in which secular speech would be allowed prevails."
 
 
 271
 Id. at 1478 (emphasis added). In order that they might support their argument, the majority in their opinion selectively quoted only the second sentence of the four sentences treating the subject matter at issue. Obviously, it is because the reasoning set forth in the four sentences dealing with this issue flies directly in the face of and in contradiction of the majority's holding. In Crestwood, the majority concluded that the festival was not open to all private groups (it assumed, as we should here, that a public forum is governed by the constitutional mandate of equal access) and that the district court's finding that the Italian mass was sponsored by the Village was not clearly erroneous. In the instant case there is no question, based upon the record, that the Jaycees sponsor the display and that Washington Park is an open forum. The majority assumes, however, that "[t]he second part of this statement [from Crestwood ], that private sponsorship of a religious display would require a different outcome, presumes that sponsorship is wholly private." Maj.Op. at 770. That assumption leaves much to be desired, as the majority in Crestwood never dealt with the issue of dual sponsorship, and in fact never stated that sponsorship must be "wholly private": "if the Crestwood Women's Club (or a church) were the sponsor of the mass, it would be difficult to find an obstacle in the Establishment Clause...." Neither the majority in Crestwood nor the majority here has cited any precedent for enjoining private speech rather than public sponsorship in the event there is dual sponsorship of religious speech. Moreover, the majority in Crestwood "assume[d] that the district judge [would] take evidence and make more detailed findings concerning the sponsorship of the mass and what, if anything, the Village has done (or could do ) to demonstrate that it is providing a public forum but not endorsement" before enjoining future religious services at the festival. Crestwood, 917 F.2d at 1479 (emphasis added). The Crestwood Court recognized that even if there were Village sponsorship of the mass in the past, the Village could remedy that in the future. Other courts have recognized the same ability of government to disassociate itself from private expression which could be attributed to it. See American Civil Liberties Union v. Wilkinson, 895 F.2d 1098 (6th Cir.1990) (conditions ordered by district court adequate to avoid impression of state endorsement of religious message inherent in a creche); McCreary v. Stone, 739 F.2d 716 (2d Cir.1984) (remand for determination of size of sign necessary to disassociate the City from a free-standing creche in a public park). The district court and the majority in the instant case gratuitously assume that no disclaimer would or could be framed that would effectively disassociate the City from the paintings; that assumption is clearly erroneous.
 
 
 272
 As further justification for refusing to apply the public forum doctrine to the Jaycees' display, the majority also cleverly misconstrues our recent opinion in Lubavitch Chabad House, Inc. v. Chicago, 917 F.2d 341 (7th Cir.1990), and distorts the Jaycees' public forum argument. In referring to our opinion in Lubavitch, the majority states that "the Court concluded that the City restriction preventing a menorah from being displayed in a public area of [O'Hare A]irport was a reasonable time, place or manner restriction on speech under applicable First Amendment jurisprudence...." Maj.Op. at 773 (emphasis added). The City regulations in Lubavitch did not prohibit "a menorah from being displayed in a public area of the airport." The regulations at issue, in clear and unambiguous language, prohibited only the erecting of free-standing structures without the leasing of space from the governmental unit for that purpose, thus enabling the City to avoid "obstructions to the use of the airport or interference with airport operations." Lubavitch, 917 F.2d at 346. The regulations made no distinction as to types of structures prohibited; any and all structures were prohibited from being erected outside of areas designated as leased space. Once again the majority justifies its fallacious reasoning through a selective quotation and once again takes words out of context and fails to quote the sentence following our statement that the Constitution does not mandate unrestricted access to public forums for the purpose of erecting structures at will: "First Amendment jurisprudence certainly does mandate that if the government opens a public forum to allow some groups to erect communicative structures, it cannot deny equal access to others because of religious considerations, Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), but the record is clear that the City has prohibited all groups from erecting structures in the airport public areas." Id. at 347 (emphasis added). The majority omits this sentence for reasons obvious, as the reasoning recited therein clearly states that we would have held unconstitutional a regulation that excluded religious structures, including Menorahs, while allowing non-religious structures. In summary we stated that "we are of the opinion that Lubavitch has no constitutional right at issue, since it is free to exercise the right to display religious symbols at O'Hare in the same manner as anyone else--by leasing space or by carrying hand-held symbols or signs." Id. (emphasis added). Ignoring this statement, as well as the fact that the regulations involved in Lubavitch were content-neutral and that O'Hare is a limited public forum, the majority states: "This recognition [that the regulations provided reasonable time, place and manner restrictions] has broader application to other cases in which claimed access to a public forum brings constitutional rights into conflict." Maj.Op. at 773 (emphasis added). Clearly Lubavitch had no constitutional right at issue since the regulations were content-neutral, so there were no conflicting constitutional rights in Lubavitch; in contrast with Lubavitch, the Jaycees have a constitutionally protected right to speak in the unlimited public forum of Washington Park absent reasonable time, place and manner restrictions. Furthermore, Doe has neither the ability nor a constitutionally protected right to impose time, place or manner restrictions on other private speakers in a public forum, as did the City of Chicago. The majority's analysis, by design, takes a convoluted twist when it applies the doctrine of reasonable time, place and manner restrictions to justify total exclusion of the paintings from Washington Park. I feel confident that the majority understands that there is a world of difference between a City attempting to regulate speech in a public forum and a private party attempting to regulate or exclude it. Yet, the majority, continuing in its misapplication of the holding in Lubavitch, analyzes this case as if the City rather than Doe were attempting to regulate the Jaycees' speech, and as if the Jaycees were claiming an absolute right to display the paintings in Washington Park in the face of reasonable time, place and manner restrictions. Neither of these conditions are true--Ottawa has not promulgated any regulations for the use of Washington Park nor is it attempting to impose any restrictions on speech, and because the Jaycees realize that content-neutral restrictions on speech are legitimate, they do not and need not claim an absolute right to speech in a public forum; the Jaycees merely argue, in accordance with well-established law, that the Establishment Clause fails to justify discrimination against religious speech in a public forum, especially in an unlimited public forum far removed from the seat of government. In light of Widmar and Mergens, I fail to understand how the majority can hold otherwise. Cases dealing with reasonable time, place and manner restrictions provide no basis for excluding religious speech from a public forum. Incidentally, I note that the Sixth Circuit, reading and applying our analysis in full context, had little trouble understanding our reasoning in Lubavitch as contrasted with the majority in this case. In describing the O'Hare regulations, the Sixth Circuit recently said, "[t]hese regulation [sic] did not apply to religious displays only, nor did they refer to the expressive content of the displays in any way. As such, they were content-neutral and constitutionally acceptable under Widmar." Congregation Lubavitch v. City of Cincinnati, 923 F.2d 458, 462 (6th Cir.1991).
 
 
 273
 The majority finds support for its exclusion of the paintings from Washington Park in two Circuit Court cases decided since the Supreme Court's decision in Allegheny, Kaplan v. City of Burlington, 891 F.2d 1024 (2d Cir.1989), and Smith v. County of Albemarle, 895 F.2d 953 (4th Cir.1990), both of which contain strong and well-reasoned dissents. In Kaplan, a Chanukah Menorah was excluded from "City Hall Park," which was next to City Hall, and in Smith, a creche was excluded from the front lawn of the County Office Building. The majority overlooks the emphasis both courts placed on the placement of the displays in relation to the near proximity of the seat of government, a factor not present here. Although I agree with the dissents in both of those cases, the J.C.C.'s display of the paintings in Washington Park is readily distinguishable from Kaplan and Smith because Washington Park is far removed (three blocks away) from any Ottawa seat of government. Thus, Kaplan and Smith are unpersuasive support for the majority's treatment of the public forum issue.
 
 
 274
 I am persuaded that two recent Sixth Circuit cases are far more convincing than Kaplan or Smith. In Americans United for Separation of Church and State v. City of Grand Rapids, 922 F.2d 303 (6th Cir.1990) (AUSCS ), the plaintiff sued the City of Grand Rapids in an effort to exclude a Chanukah Menorah from being displayed in a public forum surrounded by city buildings. Chabad House had displayed the Menorah during the Chanukah season for the past six years. The district court enjoined the display of the free-standing Menorah, and the Sixth Circuit stayed the injunction pending the final disposition of the suit. The court reasoned that Chabad House would ultimately prevail, since the Menorah was being displayed in a public forum. The court noted that Allegheny did not rest on public forum grounds, and disagreed with Kaplan and Smith. The court cited four reasons for its holding: 1) the impact of the sign disclaiming city sponsorship of the Menorah; 2) the Sixth Circuit's acceptance of the public forum argument; 3) evidence in subsequent actions regarding the Menorah at issue in Allegheny that demonstrates Supreme Court sympathy with the public forum argument; and 4) the Sixth Circuit's belief that the presence of a "privately owned and maintained religious symbol, accompanied by a sign identifying its sponsor [and disclaiming government sponsorship], for a relatively short period of time in a traditional public forum does not convey a message of governmental endorsement of religion merely because the forum is located next to City Hall...." Id. at 309 (quoting Kaplan, 891 F.2d at 1034 (Meskill, J. dissenting)). In an even more recent case, Congregation Lubavitch v. City of Cincinnati, 923 F.2d 458 (6th Cir.1991), the Sixth Circuit refused to stay an injunction requiring the City of Cincinnati to allow Lubavitch to display a lighted Menorah in Fountain Square, a public forum, during Chanukah. Cincinnati had a clear policy of refusing to allow religious symbols in Fountain Square even though it allowed other symbolic speech. The City stated that it "has not and does not permit the erection of an unattended, semipermanent religious display on Fountain Square." Id. at 461. The Court refused to grant a stay because
 
 
 275
 "the City has not made a strong showing that [the district judge] was incorrect in concluding on the facts and arguments before him that 'where a public square is maintained for the presentation of various forms of belief, social, political and religious, the municipality may not bar from that square a religious symbol which is an expression of first amendment free speech.' "
 
 
 276
 Id. at 462. Under this reasoning, if the City of Ottawa had acquiesced in Rohrer's request to ban the paintings from Washington Park, the Jaycees would have been entitled to an injunction removing the ban.
 
 
 277
 I am of the opinion that we should follow the reasoning of the Sixth Circuit in AUSCS and Congregation Lubavitch rather than the Kaplan and Smith cases upon which the majority rely. Congregation Lubavitch is the only post-Allegheny decision (of which I am aware) dealing with religious expression in open public forums removed from the seat of government, such as we have here, and the majority opinion is directly in conflict with it. Secondly, the AUSCS case, dealing with a Menorah in a public forum near the seat of government, seems more in line with opinions of our Court that have demonstrated a strong belief that private parties have a constitutionally protected right to equal access to public forums for the purpose of religious expression. Finally, the physical setting of the paintings in a public forum far removed from the seat of government creates less danger of a perception of governmental endorsement of religion than the displays in either Kaplan or Smith. Thus, the majority is on shaky ground when relying on Kaplan and Smith for excluding the Jaycees' exhibit from the Park. If the district court was of the opinion that the Jaycees' disclaimer sign was inadequate as to size or content, it might readily have remedied that problem by issuing an order requiring larger letters and a more specific disclaimer on the part of the City, including the placement thereof.
 
 
 278
 The majority seems to recognize that any content-based restriction on speech in a public forum must be narrowly tailored to serve a compelling state interest (although it never says so), Perry, 460 U.S. at 45, 103 S.Ct. at 955, and then in an ineffectual attempt to support its holding implies that exclusion of the J.C.C.'s display is the most narrowly tailored means available to Ottawa.[11] That is nonsense. The plaintiff merely requested that the court require Ottawa to enact reasonable time, place and manner restrictions on the use of Washington Park, but the district court went out on its own and well beyond the requested relief and mandated a total ban of the paintings in the Park. If the plaintiff were entitled to relief on the legal grounds specified, which she is not, enjoining such restrictions, perhaps along with a substituted type of disclaimer of City sponsorship,[12] would certainly remove the possibility that some person might suspect the display as a governmental endorsement of Christianity. Furthermore, the majority fails to address the requirement that even when reasonable time, place and manner restrictions are justified in a public forum, "the regulations [must] leave open adequate alternative modes of communication." Lubavitch, 917 F.2d at 346 (citing Ward v. Rock Against Racism, 491 U.S. 781, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989)). The requirement of leaving open alternative modes of communication when limiting speech in a public forum refers to permitting speech in a public forum rather than relegating it to private property, or it would be meaningless. The majority apparently disagrees that "adequate alternative modes of communication" must remain open in public forums, since they say that "there is no question in this case that the Ottawa Jaycees ... can move their display to private property." Maj.Op. at 774. I know of no other reported case where a court has completely excluded the communication of an idea from all public forums, nor has the district court or the majority cited one. In every case the majority cites where a court has excluded a private party's religious display or symbol, the exclusion has related only to settings located in the seat of government, never to a quintessential public forum, i.e., Washington Park, far removed from governmental buildings or environment. Under current Free Speech Clause analysis, there is no legal basis to justify the exclusion of the paintings and holding that they are entitled to less protection than other speech. Such a position, in my opinion, raises the question of judicial hostility toward all religions, which the Supreme Court condemns, certainly not the feigned neutrality the majority attempts to assert.[13] See Maj.Op. at 774. It would be an unconstitutional infringement of the J.C.C.'s right to free speech for Ottawa to totally exclude the paintings from Washington Park, and such an exclusion emanating from this Court is likewise invalid. Under a constitution that protects the free exercise of religion as well as free speech, I would think that religious speech should be near the pinnacle of protected rights, and as members of the Supreme Court have done, let us recognize that religion plays an important role in our society. I would reverse the erroneous decision of the district court.
 
 B. The Lemon Test
 
 279
 As I have established above, when private religious speech in a quintessential public forum is at issue, the Lemon test applies to the government policy alone, cf. Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (Lemon test applied to equal access policy, not the religious speech in a limited public forum), for if it applies to private religious speech, all religious expression, whether it be Buddhist, Catholic, Episcopalian, Jewish, Lutheran, Muslim, Protestant or other, would be excluded from public forums. Since Doe has failed to demonstrate that any person or group has been excluded from Washington Park, I accept as true the City's assertion that it follows the constitutional mandate of allowing equal access to the Park. Thus, the Lemon test applies only to the question of whether Ottawa's equal access policy has a secular purpose, has the primary effect of advancing religion, or promotes excessive entanglement with religion. See Lemon v. Kurtzman, 403 U.S. 602, 612-613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). Because the majority mistakenly evaluates the Jaycees' display under the Lemon test,[14] it finds the constitutional question here "not close. The Jaycees' display of the paintings fails the first two prongs of the Lemon test as elaborated in Allegheny." Maj.Op. at 759 (footnote omitted) (emphasis added). I agree that this case falls short of presenting a close question, but for reasons unrelated, separate and distinct. When the Lemon test is appropriately applied to the City policy of equal access to Washington Park rather than to the Jaycees' display, the City passes the test with flying colors, since an equal access policy is an appropriate secular purpose, it does not have the primary effect of endorsing religion, and it avoids entanglement with religion. See Mergens, 110 S.Ct. at 2370-71.
 
 1. Secular Purpose
 
 280
 The City policy of allowing equal access to Washington Park is mandated under the First Amendment. A policy of equal access is an undeniably secular purpose under current Establishment Clause jurisprudence: " 'an open-forum policy, including nondiscrimination against religious speech would have a secular purpose,' and would in fact avoid entanglement with religion."[15] Mergens, 110 S.Ct. at 2370 (quoting Widmar, 454 U.S. at 271-72, 102 S.Ct. at 275) (citations omitted) (emphasis original). The majority casts aside the equal access policy question by focusing on the Jaycees' use of the Park, and in a conclusory statement without foundation in the record sarcastically states, "[i]n applying its 'policy' of equal access, the City apparently believes that some groups are more equal than others!" Maj.Op. at 761.[16] The majority fails to explain how it could come to this conclusion first, if it viewed the record objectively, and secondly, if it followed the mandate of the law and viewed the record in the light most favorable to the Jaycees in review of a summary judgment when the record is utterly devoid of allegations that the City has ever denied access to anyone. As established above, the City is entitled to a presumption that it is following the constitutional mandate of allowing equal access to all in the use of Washington Park until the plaintiff establishes her burden of proving that the City has denied access to the forum to at least one person or group. Furthermore, as I noted in my statement of facts (supra at 793-794), Washington Park has a long history of being an open forum, dating back at least to the year 1858 when Abraham Lincoln and Stephen Douglas used it for a debate. I fail to understand how the majority can view it to be otherwise.
 
 
 281
 The majority focused primarily on whether there was a secular message in the paintings themselves, and states that "[t]he Jaycees fail in their argument to overcome the core of the paintings' spiritual nature...." Maj.Op. at 759. This statement illustrates at best the continued confusion on the part of the majority over the application of the Lemon test. Throughout its application of the Lemon test, the majority speaks of attempts on the part of the Jaycees or the City to neutralize the religious message[17] and concludes that the paintings "can never be neutralized." Id. at 768. In fact, the Jaycees never argued that the paintings have a secular message, nor need they. It is true that if the Lemon test were applicable to the paintings, the display would be required to demonstrate a secular purpose,[18] and the district judge somehow erroneously assumed without citing any legal support that the paintings must have a secular purpose: "City intended to promote that religious message, for no secular message may fairly be attributed to the display in its totality." Doe v. Small, 726 F.Supp. at 721. But as I have demonstrated, the Jaycees' purpose in displaying the paintings is immaterial; only the City's objective in allowing access to the Park matters, and the municipality's equal access policy provides an adequate secular purpose under the Supreme Court's statement in Mergens that " 'an open-forum policy, including nondiscrimination against religious speech would have a secular purpose.' " Mergens, 110 S.Ct. at 2370 (quoting Widmar, 454 U.S. at 271-72, 102 S.Ct. at 275). Thus, the religious content of the paintings is irrelevant to the analysis of the secular purpose prong of the Lemon test, and particularly irrelevant to the analysis of the City's purpose in allowing the private display.
 
 
 282
 The majority finds evidence of an absence of a City secular purpose for allowing the display in the City's resolution rejecting an effort to exclude the paintings from the annual Christmas decorations in Washington Park. In focusing on the City's alleged endorsement of the display's religious message, the majority fails to note that there was a secular purpose for allowing the display stated in the same resolution:
 
 
 283
 "WHEREAS, the City Council of the City of Ottawa finds that the decorations in downtown Ottawa which have been erected for more than the last 20 years by public and private agencies truly represent a cooperative effort by the community to provide appropriate seasonable Yuletide spirit so that people attracted by the Christmas decorations to shop and otherwise do their business in the downtown area will be benefitted by the traditional, beautiful and seasonally appropriate decorations which they have come to know and love for 2 decades. The City Council specifically finds the pictures erected by the Jaycees in Washington Park are an integral part of the seasonal decorations epitomizing Christmas in the hearts and minds of the citizens of the City."
 
 
 284
 (Emphasis added). The resolution states the permissible secular purpose of attracting people to the downtown area "to shop and otherwise do their business in the downtown area." The majority acknowledges that the Jaycees raise this argument, but inexplicably removes its acknowledgment from its discussion of the resolution, and states: "Although this purpose may in fact be secular, the City must show that there is a particularly good reason for the City to accomplish its purposes through religious means." Maj.Op. at 763 (emphasis added).[19] This statement ignores the fact that the resolution referred to the entire array of Christmas decorations provided by private parties in addition to the City as attracting people to the downtown area, and that the City considered the Jaycees' display to be an integral part of the decorations. Refusing to acknowledge that the City stated a permissible secular purpose in its resolution, the majority begs the question, for all the City did was to allow all who desired to help in the decorating of the downtown area participate. The City used no "religious means" to accomplish its secular purpose of attracting business to the downtown area. The J.C.C. provided the religious aspect of the Christmas display, and the City was and is without constitutional authority to exclude the Jaycees' religious message while encouraging secular messages. But the majority rejects the possibility of a secular purpose in the City resolution, since "[t]he City did not try to hide its approval of the religious display and even used the word 'endorse' to express its support." Maj.Op. at 760. This statement fails to give adequate consideration to the context of the resolution, which declares:
 
 
 285
 "NOW, THEREFORE, BE IT RESOLVED by the City Council of the City of Ottawa, that after due consideration and reflection upon the complaint raised in the pictures in Washington Park, that this Council endorse the activities of the Ottawa Jaycees in maintaining, erecting, dismantling and storing said pictures and incorporating them in the overall Christmas display that annually graces the downtown area of the City and further thanks all the other groups, public and private, who also maintain, erect, dismantle and store other portions of the Christmas decorations which are integral to the annual Yuletide season and the spirit thereof."
 
 
 286
 (Emphasis added). The City never endorsed the message of the paintings, but the activities of the Ottawa Jaycees "in maintaining, erecting, dismantling and storing said pictures and incorporating them in the overall Christmas display that annually graces the downtown area of the City...." The City's endorsement was of a private party's efforts and investment in contributing to the City's Christmas decorations. I plead ignorance as to how one could conceive that it would be unconstitutional for the government to express its appreciation for a private party's free and voluntary action of contributing to a Christmas display because the private party's contribution has religious content.[20] Another crucial aspect of the context of the resolution is that it was in response to a request to prohibit the Jaycees' display. The use of the term "endorse" represents the City's refusal to censor the paintings and thus display overt hostility to Christians. Moreover, it should be noted that the statement that the City "further thanks all other groups" clearly states that the City equated its "endorsement" of the J.C.C.'s activities with its expression of appreciation to any and all other groups involved in erecting, financially supporting and maintaining the Christmas displays. In closing its discussion of the City resolution, the majority says, "[a] 'statute should be held to have an improper purpose * * * [since] it is beyond purview that endorsement of religion or a religious belief "was and is the law's reason for existence." ' [Citations omitted]. In this case, it is beyond dispute that endorsement of religion was the reason for the display." Maj.Op. at 760. Frankly, this statement is incomprehensible. From the context it apparently refers to the resolution at issue although it fails to say so. But even if the resolution could properly be considered as a "statute" or "law" the resolution cannot legitimately be considered as existing to endorse religion, since it came into being as the result of an effort by a private party to censor religion.
 
 
 287
 In a context entirely distinct from its discussion of the resolution, the majority states:
 
 
 288
 "Despite the usual deference of courts to statements of legislative purpose, the Constitution prevents us from acquiescing to the Jaycees' attempt to articulate a secular purpose where really none is to be found. The Jaycees have failed to convince this Court that the City has satisfied the secular purpose requirement of Lemon."
 
 
 289
 Maj.Op. at 763 (emphasis added).[21] This statement implies that the secular purpose of promoting shopping and other business in the downtown area was an afterthought to rescue an otherwise unconstitutional resolution. How can a secular purpose stated in a resolution from a duly constituted public body be considered an "attempt to articulate a secular purpose where really none is to be found"? The majority's speculation implying that the argument is an afterthought is most troubling in an appellate Court's opinion, since the secular purpose was clearly stated in the resolution, as noted above. Rather than the Jaycees having failed to establish "that the City has satisfied the secular purpose requirement of Lemon," the majority has failed to demonstrate that the secular purpose stated in the City's resolution was invalid, or that the City's policy of allowing equal access to Washington Park was nonexistent. Thus, there is not just one but two valid secular purposes for allowing the paintings to be exhibited in Washington Park (the constitutional mandate of allowing equal access and the legitimate goal of attracting business to the downtown area), so the City easily passes the first prong of the Lemon test.
 
 2. Primary Effect or Endorsement
 
 290
 The second prong of the Lemon test prohibits a statute or practice from having the primary effect of advancing or inhibiting religion. Lemon, 403 U.S. at 612, 91 S.Ct. at 2111. In Allegheny, the Supreme Court adopted Justice O'Connor's "endorsement" test from Lynch as the relevant query for the primary effect of a government statute or practice. See Allegheny, 109 S.Ct. at 3100-03. Whether a government practice endorses religion "depends upon the message that the government's practice communicates: The question [when a government display is at issue] is 'what viewers may fairly understand to be the purpose of the display.' " Id. at 3102. The majority overlooks the context of the Court's statement in Allegheny and applies this statement directly to the Jaycees' display. It is only when the government presents the display, however, that a viewer's perception of the display is an issue;[22] when a private party exhibits a display in a quintessential public forum removed from the seat of government, it is the government practice allowing the display that must be judged according to "what viewers may fairly understand to be the purpose of [the government policy]." If "[t]he proposition that schools do not endorse everything they fail to censor is not complicated," Mergens, 110 S.Ct. at 2372, neither is the proposition that cities "do not endorse everything they fail to censor" in an unlimited public forum. Most viewers are unlikely to perceive a governmental policy of allowing equal access to all speech, including religious expression, as an endorsement of religion.
 
 
 291
 The Supreme Court has clearly rejected the proposition that allowing equal access for religious speech in limited public forums has the primary effect of advancing religion, see Mergens, 110 S.Ct. at 2371 ("the message [sent by equal access] is one of neutrality rather than endorsement"), Widmar, 454 U.S. at 273-74, 102 S.Ct. at 276 ("In this context we are unpersuaded that the primary effect of the public forum, open to all forms of discourse, would be to advance religion."), and I am unpersuaded that it would hold differently here. Speech in a forum established by the government for a limited use, such as in Mergens and Widmar, carries far more of an implication of government endorsement than speech in a forum such as Washington Park that has been unregulated for as long as one can remember. If "secondary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a non-discriminatory basis," Mergens, 110 S.Ct. at 2372, the general populace is "likely to understand that [the City] does not endorse or support [private] speech that it merely permits on a non-discriminatory basis." Significantly, there is no allegation in the record that the City treated any user of Washington Park less favorably than the J.C.C. Thus, there is no discrimination to imply City endorsement of the Jaycees' religious beliefs.
 
 
 292
 Rather than analyzing the primary effect of the City's policy, the majority focuses on the alleged effect of the paintings. It asserts that Allegheny requires an examination of the context as well as the content of this private display in a public forum.[23] The crucial context in Allegheny was the presence of a religious display on the County Courthouse stairway, "the seat of county government. No viewer could reasonably think that it occupies this location without the support and approval of government." Allegheny, 109 S.Ct. at 3104 (citation and footnote omitted). The Court stated that in view of the limited nature of the forum at issue, "any display located there fairly may be understood to express views that receive the support and endorsement of the government." Id. at n. 50. Moreover, the Court specifically noted that it was not addressing the issue of a private religious display in a public forum like the case at hand: "the creche here does not raise the kind of 'public forum' issue ... presented by the creche in McCreary v. Stone...." Id. (citations omitted). The majority recognizes that the J.C.C.'s display in Washington Park is removed from the seat of government (although it ignores the public forum distinction) but finds that "the placement of the paintings in the Park still effects an impermissible endorsement of religion." Maj.Op. at 766. Initially, the majority supports its conclusion by stating that
 
 
 293
 "the paintings occupy much of the length of the entire western side of the Park. When they are on display, they are visible so that passers-by on La Salle Street will view them night and day. The extent to which the paintings are a prominent fixture of the Park during the Christmas season and beyond supports the finding that the City, in approving this major display, endorsed its religious message."
 
 
 294
 Id. at 766 (footnote omitted). The paintings occupy less than one half of the length of the western side of the Park, and even a casual glance at the Jaycees' night photographs of Washington Park (Jaycees' Exhibit Q, Q-2, R and S) reveals that the paintings are dwarfed by the rest of the Christmas decorations. Moreover, since the Constitution prohibits the City from excluding religious speech from a public forum on the basis of its content, Ottawa was without constitutional authority to disapprove the display. The City's only constitutional alternative to placing no restrictions on the display would have been to enact reasonable time, place and manner restrictions that would apply to all private speech equally. There is no constitutional requirement, however, that the City must enact such regulations. Secondly, the majority argues that the presence of the concrete foundations to support the paintings "sends a message that the government property provides a permanent home for an annual private religious display." Id. at 766. So what follows? Public forums are required to be open to religious messages as well as secular ones. Indeed, the Park is far less a permanent home for the display than it is for the War Memorial, for the paintings are in storage most (10 months) of the year. Since the City has allowed a private organization to erect a permanent expression of its appreciation to war veterans, the City may not prohibit another private organization from expressing its religious beliefs from time to time. Furthermore, the record contains statements from City officials to the effect that if someone else wished to use the supports for their own display, or wished to install their own supports, they would be free to do so.[24] With no evidence to the contrary, the only legitimate inference to be drawn from the record is that the City of Ottawa is demonstrating neutrality toward religion. Finally, the majority discounts the City's "festival of lights," including a fifteen-foot snowman, the Salvation Army's Christmas tree and the paintings, as providing an overall Christmas display because the message in the paintings conveys more than the facts of Jesus' birth.
 
 
 295
 "[W]ith the exception of three of the paintings, the message of the display commemorates much more than the story of Jesus' birth. A painting of the Sermon on the Mount, the stilling of a lake storm, the Last Supper, or the crucifixion does not complement the secular symbols of Christmas to make an integrated Christmas holiday display--each canvas portrays religious elements of Christian theology."
 
 
 296
 Id. at 767. The celebration of Christ's life as well as his birth is indistinguishable from celebrations of the birthdays and lives of George Washington, Abraham Lincoln, or Martin Luther King. In each of these celebrations, the birth of the person would be irrelevant without the accomplishments of the person's life. I fail to see why the celebration of Christ's birthday should be different.
 
 
 297
 The majority relies on the history and duration of the display to reject the Jaycees' suggestion that in light of the addition of the Festival of Lights in 1988, the specific physical context of the paintings would not violate the Constitution even if they were displayed by the City. Maj.Op. at 768. This novel and unprecedented departure from Justice O'Connor's use of the "history and ubiquity" of a practice is invalid. In Allegheny, Justice O'Connor stated
 
 
 298
 "Under the endorsement test, the 'history and ubiquity' of a practice is relevant not because it creates an 'artificial exception' from the test. On the contrary, the 'history and ubiquity' of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion."
 
 
 299
 Allegheny, 109 S.Ct. at 3121. The majority once again quotes selectively, thus taking this language out of context. It omits the last phrase of this quotation, "evaluates whether a challenged governmental practice conveys a message of endorsement of religion" and continues down nearly one-half of the column until it comes to the language "would view such long-standing practices as a disapproval of their particular religious choices" to turn this language of Justice O'Connor's, which justifies upholding religious practices which might otherwise be excluded, to justify excluding religious practices because of their history and ubiquity.[25] The history (or ubiquity) of a practice has never before, to my knowledge, been used to justify declaring the practice unconstitutional. To the contrary, in Mather, the Village of Mundelein "added a Christmas tree with lights and, after questions had been raised about the propriety of displaying a creche on public property, many other symbols of the season--a Santa Claus and sleigh, carolers, snowmen, carriage lights, wreaths, and two soldiers in the shape of nutcrackers." Mather, 864 F.2d at 1292. The City of Ottawa's addition of the "festival of lights" and the snowman is indistinguishable from the augmentation of the Village's Christmas display in Mather. In the context of the over-all Christmas display in Washington Park, the paintings depicting the life of Christ would be constitutional even if they were displayed by the City.
 
 3. Government Entanglement with Religion
 
 300
 Under the third prong of the Lemon test, a state policy "must not foster 'an excessive government entanglement with religion.' " Lemon, 403 U.S. at 613, 91 S.Ct. at 2111 (citation omitted). The inevitable result of the majority's holding is that governmental entities will be thrust into direct entanglement with religion anytime a private speaker wishes to display or communicate religious concepts in a public forum. The majority's detailed analysis of the paintings and holding them unconstitutional because they are "a Christian display, not a Christmas display," Maj.Op. at 765, implies that the City of Ottawa should have censored the religious content of the display before deciding to allow it.[26] If the City of Ottawa were to conduct a theological analysis of private religious messages before allowing them in Washington Park, it would be engaging in precisely the "excessive government entanglement with religion" prohibited in Lemon. The Supreme Court recently criticized the risk of such entanglement in Mergens: "Indeed, as the Court noted in Widmar, a denial of equal access to religious speech might well create greater entanglement problems in the form of invasive monitoring to prevent religious speech at meetings at which such speech might occur." Mergens, 110 S.Ct. at 2373. In the present case, the majority would have the City of Ottawa engage in invasive monitoring of the religious content of displays in Washington Park. Evaluating the propriety of the religious content of private speech in a public forum clearly entails governmental entanglement with religion.
 
 
 301
 Furthermore, who are we, a United States Court of Appeals, to sit in judgment on the theological content of a religious message? The majority states:
 
 
 302
 "Christians commemorate Christmas in different ways: through children's stories such as 'The Little Drummer Boy' or through Christmas carols such as 'Silent Night,' 'We Three Kings,' 'Hark, the Herald Angels Sing,' and 'What Child is This.' All of them celebrate or recount the story of the birth of Jesus. None of them recall the events depicted in thirteen of the paintings. The story of the loaves and fishes, the baptism of Jesus, the road to Emmaus and the Last Supper simply do not figure into the story of the holiday in either its religious or secular variations.
 
 
 303
 * * * * * *
 
 
 304
 "[T]he pictures in the Park evoke in the mind of the observer much more than the story of Jesus' birth. Indeed, the name of the display itself, 'The Greatest Story Ever Told,' encompasses the life, crucifixion, and resurrection of Jesus--not just the Christian miracle of his birth. It is a Christian display, not a Christmas display. Indeed, the paintings proclaim and showcase the core tenets of the Christian religion by communicating the entire story of Jesus."
 
 
 305
 Maj.Op. at 764-765 (emphasis added).[27] I do not believe it is within the jurisdiction of the federal courts, nor are they qualified, to determine what is or is not a theologically acceptable message for Christians to proclaim at Christmas. As the former president of the American Bar Association, Chesterfield Smith, stated in a Law Day address:
 
 
 306
 "As far as possible, judicial forums should be reserved for doing only that which cannot be done elsewhere.
 
 
 307
 "The American public perceives the courts as a jack-of-all trades available to furnish the answer to whatever may trouble them. Shall a war be prosecuted or peace made? What is life, or when does death begin? Shall racial integration be achieved by ... busing of children to far away schools? How shall prisons and mental institutions be operated? Shall nuclear power plants be built, and if so, where? Shall the Concorde fly to these shores? Is affirmative action really inverse discrimination? Shall the snail darter survive? [Is the entire life of Christ an appropriate subject to consider at Christmas?]"
 
 
 308
 (Quoted in In Matter of Guardianship of Eberhardy, 102 Wis.2d 539, 587, 307 N.W.2d 881 (1981) (Coffey, J., concurring) (emphasis added)). Deciding issues such as the proper theological content of a Christmas display undermines the legitimacy of our judicial function of deciding disputed issues of fact and applying the law thereto.
 
 
 309
 In decreeing what it feels is an appropriate Christmas message, the majority has apparently ignored the Jaycees' answer to the Second Amended Complaint, which denied "that the life of Jesus is irrelevant to the story of Christmas," as well as the testimony from a representative of the Jaycees to the effect that:
 
 
 310
 "In order for there to be death there has to be life and at Christmastime we celebrate the life of Christ, and to celebrate a figure who has lived and his earthy [sic] remains have died, it is appropriate that we recollect his entire being and Christmastime is a time that we appreciate Jesus, not just his birth, but his entire life."
 
 
 311
 Even if it were appropriate for a federal court to determine the proper content of a religious message at Christmastime, which I doubt, on this record and on review of a summary judgment, we should accept as true the testimony that the paintings convey a suitable Christmas message for all. Regardless, in order to avoid excessive entanglements with religion, governmental entities should leave such theological judgments to theologians.
 
 C. Constitutionally Protected Speech
 
 312
 Although Doe has framed this litigation as a request for relief from a violation of the Establishment Clause, when the smoke screen spawned by Doe's argument is dissipated, it is clear that this suit is nothing more than a complaint that the J.C.C.'s private religious expression offends Doe. The fact that a certain type of private speech may offend one or more listeners, however, is certainly inadequate to justify excluding it from a public forum. See Cohen v. California, 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971) (four-letter word on jacket in Courthouse constitutionally protected even though morally offensive); Collin v. Smith, 578 F.2d 1197, 1205-06 (7th Cir.1978) (trauma likely to be created by Nazi march in Skokie, Illinois inadequate to support prohibition of parade: "mere public intolerance or animosity cannot be the basis for abridgement of these constitutional freedoms."). The Jaycee's exhibit is analogous to Cohen's jacket containing offensive words and the Nazi parade in Skokie, Illinois in that all are modes of expression protected under the First Amendment. When the speech at issue is private speech, as here, interference with another private person's enjoyment of public facilities fails to constitute a cognizable harm. Indeed, even if the City of Ottawa were to adopt Doe's belief that the paintings are offensive, the Constitution would prevent the City from banning the paintings from the Park:
 
 
 313
 "Of course, the mere presumed presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense.... The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is ... dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner.... Those in the Los Angeles courthouse could effectively avoid further bombardment of their sensibilities simply by averting their eyes. And, while it may be that one has a more substantial claim to a recognizable privacy interest when walking through a courthouse corridor than, for example, strolling through Central park, surely it is nothing like the interest in being free from unwanted expression in the confines of one's own home."
 
 
 314
 Cohen, 403 U.S. at 21-22, 91 S.Ct. at 1786. In the instant case, Doe is unable to assert a privacy interest in the use of Washington Park. Thus, if the Jaycees' exhibit offends her, she is free to avert her eyes. If the Constitution prohibits the government from excluding the morally offensive speech involved in Cohen or the hate-inspired parade of the Nazis in Collin v. Smith, it certainly prohibits both this Court and the City of Ottawa from excluding the J.C.C.'s exhibit from the Park.
 
 CONCLUSION
 
 315
 In applying the Lemon test to private speech in a quintessential public forum, the majority is instituting a dangerous and novel precedent of far reaching import. If this decision stands, private religious speech will be banned from public forums. Rather than demonstrating neutrality toward religion, a policy of banning private religious speech from a public forum clearly demonstrates hostility.
 
 
 316
 Such judicial hostility toward religion is particularly inappropriate at this time with the recent war in the Persian Gulf bringing about an out-pouring of public acknowledgement of faith in God and public acknowledgment of prayer to Him. Immediately after the war began, the news media was full of references to prayers from public leaders as well as private individuals. Are we to consider all of their remonstrations examples of unconstitutional activity? On February 17, 1991, CNN reported that synagogue and church attendance was up twenty to twenty-five percent nation-wide as a result of the war. Furthermore, our ground forces as well as our pilots in the Mid-East were requesting additional chaplains. Thus, the war has highlighted the fact that America is a religious nation. The judiciary should not allow itself to be the willing tool of those who wish it were otherwise.
 
 
 317
 "Our nation should encourage its citizens to express their religious beliefs or lack thereof, within constitutional limits whether it be through Judaism, Christianity or any other belief that emphasizes the importance of moral values. What better vehicle do we have to strengthen the eroding moral fibre of this nation, which has been sapped of its very vitality by the increased emphasis in public education and all facets of life on materialism, relativism and on unhealthy secularism? We should strive for a re-birth of morality and human responsibility (with every right there is a corresponding obligation) in a concerted effort through public education, the pulpit, the bema, the news media, radio and television programs. What better course can we follow to effectively address the escalating national cancers of child abuse (2 million a year), drug abuse (four million heavy drug users), teen pregnancies (1 million per year), unwed mothers ( 1/4 of all births), divorce (one out of two marriages) and murder (one every 24 minutes)? No great nation has ever maintained its position as a world power without a strong moral foundation. See 1 A. Toynbee, A Study of History (abr. ed. 1947). Let us not contrive ways to make it difficult for people to practice the religion of their choice."
 
 
 318
 Doe v. Village of Crestwood, 917 F.2d at 1494 (Coffey, J., dissenting) (emphasis original). I regret to point out that the majority seems to have forgotten that we were founded and remain a "nation under God with liberty and justice for all" whether they be atheists, Christians, Jews or otherwise. The decision of the district court should be reversed, and summary judgment should be entered for the Jaycees.
 
 
 319
 I dissent.
 
 
 320
 1 The City of Ottawa, Illinois, its Mayor and the members of its City Council were defendants in the original action below but have not joined the appeal from the district court's grant of summary judgment for plaintiff. Throughout this opinion, the appellant-intervenor-defendant will be termed "Jaycees" or "defendant."
 
 
 321
 2 The Honorable Myron L. Gordon, Senior District Judge for the Eastern District of Wisconsin, is sitting by designation.
 
 
 322
 3 The Establishment and Free Exercise Clauses of the Constitution read, "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; * * *." U.S. Const. Amend. 1. The First Amendment applies to the states through the Fourteenth Amendment. Everson v. Board of Educ., 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); Cruz v. Beto, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972).
 
 
 323
 4 Photographs of the 16 paintings are reproduced here in the appendix to the majority
 
 
 324
 opinion.
 
 
 325
 5 Nothing in the record indicates that, aside from the illumination provided by the street lights on LaSalle Street, special lighting was ever installed expressly for the purpose of illuminating the paintings at night.
 
 
 326
 6 The district judge properly admitted this and other newspaper articles as party admissions. On appeal, defendants have not contested this evidentiary ruling by the trial court.
 
 
 327
 7 Plaintiff disputes the Jaycees' approximations, arguing that the defendant based its approximation on information and belief, making this chronology improper evidence in support of defendant's motion for summary judgment. Plaintiff claims that the paintings were on display for an average of 11 weeks each year. (Plaintiff's Br. at 4 n. 3.)
 
 
 328
 8 Rohrer subsequently lost standing to pursue the suit when he moved out of state. The district court permitted the substitution of Jane Doe, allowing her to proceed anonymously so that she would not be subjected to the same vilification and harassment as Rohrer endured. Rohrer and Doe both alleged injuries sufficient to confer standing to bring this action. In contrast to a recent opinion of this Court, Harris v. City of Zion, 927 F.2d 1401 (7th Cir.1991), in which Judge Easterbrook's doubts about the plaintiffs' standing provided a basis for his dissent, id. at 1419-1422, the plaintiff's standing in this case is uncontested.
 
 
 329
 9 To the extent that there are contested facts to be decided here that determine the outcome of this lawsuit, they are facts considered in light of the law to resolve the ultimate constitutional legal questions at issue. These have also been described by other jurisdictions as "constitutional facts" or "mixed questions of law and fact." They are therefore subject to de novo review by this Court. Bose Corp. v. Consumers Union, Inc., 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). In Bose, the Supreme Court held in a defamation suit that evidence of actionable "actual malice" had to be independently considered by a reviewing court, because "[j]udges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof," id. at 511, 104 S.Ct. at 1965. Bose contains language confirming its application across First Amendment jurisprudence: "The simple fact is that First Amendment questions of 'constitutional fact' compel this Court's de novo review." Id. at 509 n. 27, 104 S.Ct. at 1964 n. 27.
 
 
 330
 The determination as to whether a particular government practice survives scrutiny under the Establishment Clause turns on what can be described as the evaluation of constitutional facts. In her concurrence in Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), Justice O'Connor identified the relevant constitutional factual inquiry in scrutinizing the constitutionality of a legislated moment of silence in public schools. The question is "whether an objective observer, acquainted with the text, legislative history, and implementation of the [challenged] statute, would perceive it as a state endorsement of prayer in public schools." Wallace v. Jaffree, 472 U.S. at 76, 105 S.Ct. at 2500 (O'Connor, J., concurring).
 
 
 331
 Two appellate courts have also recognized the applicability of the constitutional fact doctrine to cases involving alleged violations of the religion clauses of the First Amendment. New Life Baptist Church Academy v. Town of East Longmeadow, 885 F.2d 940, 942-943 (1st Cir.1989) (recognizing the reviewing court's obligation under Bose to make an independent examination of the whole record to determine the constitutional significance of the facts in the case), certiorari denied, --- U.S. ----, 110 S.Ct. 1782, 108 L.Ed.2d 784 (1990); Bender v. Williamsport Area School Dist., 741 F.2d 538, 542 n. 2 (3rd Cir.1984) (applying constitutional fact doctrine to Establishment Clause analysis in case involving the use of a public area for a non-denominational prayer club meeting), vacated for lack of standing, 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986). The court in Bender suggested on its review of the grant of summary judgment that where constitutional facts are at issue, a reviewing court is not required to draw inferences in a light most favorable to the non-moving party: "[A]n appellate court is free to draw its own inferences from the record. * * * As a result [of Bose ] we do not defer to the same extent to factual inferences drawn from the record by the district court as we might in a case not involving constitutional and, in particular, first amendment rights." Bender, 741 F.2d at 542 n. 3.
 
 
 332
 10 This is not the first time that the Framers' intent and Supreme Court jurisprudence have been the object of controversy in Washington Park. As the Jaycees note, the Park was the site of the first debate between incumbent Illinois Senator Stephen Douglas and candidate Abraham Lincoln in the future President's unsuccessful effort to unseat Douglas in 1858. Then the issue was slavery, not religion, and the Supreme Court decision at issue was Dred Scott v. Sandford, 60 U.S. (19 How.) 393, 15 L.Ed. 691, not Allegheny. Lincoln invoked the intent of the founding fathers, arguing that they would have favored halting the spread of slavery in preparation for slavery's "ultimate extinction." First Lincoln-Douglas Debate, Ottawa, Illinois, 1 ABRAHAM LINCOLN, SPEECHES AND WRITINGS 514 (D. Fehrenbacher ed. 1989).
 
 
 333
 11 Professor Laycock responds to the arguments in support of the coercion approach by pointing out that such a narrow reading makes the two religion clauses of the Constitution redundant:
 
 
 334
 Religious coercion by the government violates the free exercise clause. Coercion to observe someone else's religion is as much a free exercise violation as is coercion to abandon my own. If coercion is also an element of the establishment clause, establishment adds nothing to free exercise.
 
 
 335
 Laycock, "Nonpreferential" Aid to Religion: A False Claim About Original Intent, 27 WM. & MARY L. REV. 875, 922 (1986).
 
 
 336
 For a contrasting view supporting the "coercion" approach to Establishment Clause analysis, see Michael W. McConnell, Coercion: The Lost Element of Establishment, 27 WM. & MARY L. REV. 933 (1986).
 
 
 337
 12 The third Lemon prong, the "entanglement" prong, was not considered by the district court.
 
 
 338
 13 The City attempted to offer a secular purpose for the Resolution by engaging in a quasi-legislative historical analysis. The City pointed to a 1988 deposition by the Mayor pro-tem at the time. The Jaycees claim that he testified that the City passed the resolution to avoid litigation by the Jaycees for an unconstitutional restriction on their right of access to a public park.
 
 
 339
 Although the City attempted to offer this testimony as the history of the resolution, this testimony related to events that took place two years after the Resolution endorsing the Jaycees' activities was passed. The statements by the Mayor pro-tem concerned another entirely different resolution passed in response to Rohrer's 1988 request that the City remove the pictures from the Park. This resolution denied the Jaycees' request to display the paintings during 1988-89. It was subsequently reversed when the City decided to permit the display and risk litigation by Rohrer. The district judge determined that even if the testimony were offered as a secular purpose for the City's 1986 resolution endorsing the Jaycees' display, it would fail to provide a secular purpose for the paintings. If a governmental body were permitted to argue that its secular purpose in endorsing a religious message was to avoid threatened litigation, then private parties couldengage in a variety of religious activities in disregard of the requirement of the Establishment Clause, and the governmental body would offer in defense its fear of litigation as a secular purpose. Doe v. Small, 726 F.Supp. 713, 720 (N.D.Ill.1989). Such a post hoc justification fails to provide a secular purpose for actions undertaken in support of an undeniably religious message.
 
 
 340
 14 As noted above in Part I.A. on one occasion, George Bush, campaigning for the Presidency, made an appearance in Washington Park. A temporary platform was erected for his visit--it was dismantled after the campaign event. See Affidavit of Charles Singer, Ottawa City Clerk, Defendant's Exhibit No. 3, for a list of other one-time events taking place in the Park between June 1982 and September 1988.
 
 
 341
 15 As demonstrated below, this case is easily distinguished from the cases where the Supreme Court upheld the right of student religious groups to meet on the premises of an educational institution. Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); Board of Educ. v. Mergens, --- U.S. ----, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). See also Smith v. County of Albemarle, 895 F.2d 953, 959-960 (4th Cir.1990) (finding that the county government had a compelling interest in prohibiting the Jaycees' display of a creche on a public lawn). See discussion in Part II.B.2.c. infra.
 
 
 342
 16 The Jaycees argue that Allegheny is irrelevant to an examination of secular purpose, because that case focused only on endorsement. Instead, the Jaycees would have this Court adopt a bright-line rule based on its reading of Lynch and American Jewish Congress. Both cases found that the celebration and recognition of the Christmas holiday season evince a permissible secular purpose. This recognition does not end the inquiry, for a court scrutinizing the display must ascertain whether or not the practice in question actually advances the asserted secular purpose. In Lynch, the Supreme Court found a secular purpose sufficient to uphold a state-sponsored creche display in a park owned by a nonprofit organization. 465 U.S. at 668, 104 S.Ct. at 1355. However, in American Jewish Congress, this Circuit found unconstitutional the display of a nativity scene in Chicago's City Hall. Although the majority opinion rested its conclusion on an application of the endorsement prong of the Lemon test, in applying prong one of the Lemon test, it found no "invidious purpose." American Jewish Congress, 827 F.2d at 127. Finding there to be "no invidious purpose" and finding there to be a "secular purpose" are not necessarily one and the same.
 
 
 343
 The inquiry into secular purpose does not end with the mere assertion of a purpose. Rather, the purported purpose must be applied to the specific facts at hand to determine whether that purpose is advanced by the display. To that extent, there is inevitably some overlap between the application of the first two prongs of the Lemon test. A thorough inquiry into purpose necessitates consideration of a display's content and context. Therefore, the analysis of Allegheny is indispensable to a consideration of secular purpose. To suggest otherwise overlooks the import of Allegheny, the most recent case from the Supreme Court bearing a factual similarity to this one in that Allegheny also considered the constitutionality of a religious display.
 
 
 344
 17 The dissent accepts as fact the Jaycees' contention that the paintings embrace an area equal to only 6.34 percent of the Park. See Dissent at 794. It is undisputed, however, that the length of the display from one end to another is 177 feet and that the side of the Park on which the paintings are aligned measures 366 feet. The Jaycees' area measurement appears to include the airspace above the foundations of the paintings. On the other hand, plaintiff asserts that the paintings occupy fully 20 percent of the Park. Even if we accept the defendant's asserted measurements, the resolution of this factual dispute will not alter the outcome of the suit under governing Establishment Clause analysis. Constitutionality does not turn on the creative use of a tape measure.
 
 
 345
 18 Nor are the paintings like the display of a Nativity scene that was upheld by this Circuit in Mather, 864 F.2d 1291, 1293. In that case, the Court found constitutional a display that included a creche along with many other symbols of the Christmas season. Like the creche in Lynch, viewers of Mundelein's display would see a grouping of symbols, "most of which are secular." Mather, 864 F.2d at 1293. Because the creche was a part of a larger display, it passed constitutional muster despite its location on the grounds of city hall.
 
 
 346
 19 The Jaycees urge us to consider only the most recent year of the display, claiming that the history of the display is constitutionally irrelevant. In arguing that we should consider only the "status quo," the Jaycees rely on Lovell v. Brennan, 728 F.2d 560 (1st Cir.1984). In Lovell, the court declined to grant injunctive relief where the defendants ceased their unconstitutional conduct. In this case, there is no indication that the City agreed to discontinue its unconstitutional conduct; therefore, we cannot overlook the City's longstanding Establishment Clause violation. Presently, there is no "mootness" problem while the constitutional violation persists, and the case remains ripe for this Court's consideration.
 
 
 347
 20 The dissent relies on two recent Sixth Circuit cases to support its position that a private religious display in a public forum is constitutionally protected expression. Dissent at 809-810. In the first case, Americans United for Separation of Church and State v. City of Grand Rapids, 922 F.2d 303 (6th Cir.1990) ("AUSCS "), the court held that a private religious group responsible for the display of a menorah in a public forum could intervene as of right in an action against the city to enjoin the display. Although the court "strongly emphasize[d] that we are not now deciding the appeal," it stayed the district court's decision to issue an injunction against the City believing that the private religious group was likely to succeed on the merits. Id. at 306-307. Unlike the Jaycees' display, the record in AUSCS lacks evidence of a history of government approval of the display. Moreover, the court found the disclaimer sign to be "large and explicit," id. at 310. The menorah was displayed in a public forum that was equally available to other religious groups with permission. In contrast, access to Washington Park was admittedly governed by no policy at all. The court in AUSCS also acknowledged that the demographics in Grand Rapids made it unlikely that the reasonable observer would conclude that the city endorsed Judaism. In Ottawa, the demographics, given the history of the display and the public reaction against the filing of the lawsuit, could only mediate in favor of a contrary conclusion. See, e.g., Voice of the People, Ottawa Daily Times, Nov. 11, 1986, Plaintiff's Exhibit No. 50 (letter to the editor recognizes that the display commemorates "our country's major religion").
 
 
 348
 The other Sixth Circuit case embraced by the dissent also failed to reach the merits of the alleged Establishment Clause violation. In Congregation Lubavitch v. City of Cincinnati, 923 F.2d 458 (6th Cir.1991), the court vacated the district court's issuance of a preliminary injunction against the display of a menorah in a public square. However, the analysis by the court is thin, for the court concludes simply that Cincinnati's exclusion of the menorah was not content neutral. Id. at 461. In addition, the case is easily distinguishable, for the display was exclusively sponsored by a private group and the public square provided a forum for other displays over an extended period of time. Id. at 462.
 
 
 349
 21 There is a permanent veterans memorial in the Park but it has no religious connotations.
 
 
 350
 22 The Jaycees' position plainly proves too much. If the City not only permitted the Jaycees to display the paintings, but also allowed the organization to build a church so that citizens could attend services at the same time they visited the Park to view the paintings, the use of public lands for a house of worship would offend the core of the Establishment Clause even though the Park is a public forum.
 
 
 351
 23 The Jaycees argue that the presence of their small disclaimer alongside the paintings display shows that the display is protected speech by a private group. However, the disclaimer was posted by the Jaycees, and not by the City. The conclusion to be drawn is that the City endorses the activity of a private organization on public grounds. Justice Blackmun, addressing the presence of a similar disclaimer in Allegheny, wrote:
 
 
 352
 The fact that the creche bears a sign disclosing its ownership by a Roman Catholic organization does not alter this conclusion [of endorsement]. On the contrary, the sign simply demonstrates that the government is endorsing the religious message of that organization, rather than communicating a message of its own.
 
 
 353
 Allegheny, 492 U.S. at 600, 109 S.Ct. at 3105.
 
 
 354
 1 Although I address the Lemon test here out of necessity in response to the majority's opinion, I am unconvinced that the Lemon test is capable of providing a consistently principled rationale for analyzing religious expression. The test has received criticism from members of the Supreme Court, see, e.g., County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 109 S.Ct. 3086, 3134, 106 L.Ed.2d 472 (1989) (Kennedy, J., concurring in part and dissenting in part) and cases cited therein, as it yields incongruent results. As an example, a majority of the Court reasoned in Allegheny that a creche on the steps of the County Courthouse failed the Lemon test while a Chanukah Menorah outside the City-County Building was proper. In our own Circuit, we have held that a governmental entity may display a creche on public property, see Mather v. Village of Mundelein, 864 F.2d 1291 (7th Cir.1989), but the majority here would exclude a private religious display from public property. Such inconsistencies demonstrate that the Lemon test is an inadequate barometer of the constitutionality of religious speech and conduct. I am of the opinion that we would achieve results that are far more principled and consistent under the Establishment Clause if we were to focus our inquiry on the issue of whether the government has engaged in some form of coercion, either overt or subtle, that presents a realistic danger that the government is attempting to establish a particular religion. Without such coercion, I doubt that there can be a governmental establishment of religion. See Allegheny, 109 S.Ct. at 3136; see also Doe v. Village of Crestwood, 917 F.2d 1476, 1491 (7th Cir.1990) (Coffey, J., dissenting). Analyzing claims such as Doe's under a "coercion" test would a) clearly portray the spurious nature of Doe's hypothetical "injury" from the Jaycees' display, b) provide a principled rationale for deciding Religion Clause cases in a consistent manner, c) remove the impression of judicial hostility toward religion engendered by the inconsistent application of the Lemon test, and, perhaps, d) restore a measure of the religious liberty, guaranteed by our Constitution, that has eroded under the consistent assaults of those who are striving to exclude religion from public cognizance.
 
 
 355
 2 The complaint does not allege that the Jaycees are acting for or on behalf of the government, thus the actions of the City prior to the date the Jaycees began displaying the paintings are immaterial to the issue of whether the Jaycees' display is private speech.
 
 
 356
 3 The record manifests, as the majority concedes, that the City has neither provided lighting nor paid any electric bills to illuminate the paintings (the paintings are not illuminated). The paraphrase of the mayor stating that the City would pay electric bills but would not provide financial help is inconsistent. The record is clear that the City has incurred no expense for the Jaycees' display of the paintings. Indeed, the City is not even defending this law suit--the Jaycees through the National Legal Foundation is defending it.
 
 
 357
 4 The majority once again misstates the record, this time as to the Jaycees' argument when it says, "[i]n arguing that the doctrine of the public forum rescues the City from Establishment Clause analysis, the defendant would have us invent an unprecedented exception to the Establishment Clause." Maj.Op. at 769. The Jaycees have not argued, however, "that the doctrine of the public forum rescues the City from Establishment Clause analysis." Rather, the Jaycees argue that the Lemon test is inapplicable to private speech in a quintessential public forum. Thus, the Jaycees' argument requests no "exception" from the Establishment Clause, for the Establishment Clause has never before been applied to private religious speech in an open public forum removed from the seat of government.
 
 
 358
 5 Indeed, almost all who identify with a Christian belief respect the biblical record of the miraculous birth, life, death and resurrection of Christ.
 
 
 359
 6 The majority finds an "apparent clash between the government's obligation to adhere to the Establishment Clause and a private speaker's right of free expression." Maj.Op. at 773. This clash is non-existent, for a private speaker's expression fails to implicate the Establishment Clause. It is only when governmental conduct, as opposed to private conduct, discriminates in favor of religion that there is a violation of the Establishment Clause. Such governmental conduct is unconstitutional, but eliminating discriminatory conduct in favor of religion has never justified discrimination against religion. Government policy must be neutral.
 
 
 360
 7 This is a non sequitur for two reasons: (1) Whether private speech in a public forum is secular or religious is irrelevant to whether the government intends to promote it, and there is no presumption that every private speech in a public forum is promoted by government; (2) The government is not required to limit private speech in a public forum to secular messages--if so, no religious group could ever use public parks. Indeed, as I shall demonstrate hereinafter, it would be unconstitutional for the City to exclude the display on the basis of its religious content. Thus, the most reasonable inference to draw from the City allowing the display is that the City was following the constitutional mandate of allowing equal access to public forums, a concept the district court neglected to consider.
 
 
 361
 8 The majority tracks the district court's position: "Indeed, it would be surprising if City had in fact acted to promote the now-asserted open forum policy. City Defendants admit City has never formally stated any such policy, and nothing in its conduct really supports the notion that any such concept was at work here." Doe v. Small, 726 F.Supp. at 720 n. 16.
 
 
 362
 9 I have demonstrated above that the majority's implication that the display is not private speech is invalid. See supra at 796-799.
 
 
 363
 10 Even if the City's conduct in recent years could be construed as making it a sponsor of the display, the appropriate resolution of the problem would be an order enjoining any such further sponsorship.
 
 
 364
 11 "[T]he Fourth Circuit [in Smith ] recognized that excluding the creche from public property was necessary and the most narrowly tailored means available to the court to comply with the Constitution." Maj.Op. at 774.
 
 
 365
 12 The Jaycees' 20 1/2" by 21 1/4" sign, which the plaintiff's photograph in Exhibit 17 demonstrates, is easily readable from the sidewalk, states in 1 1/16" high letters, "THIS DISPLAY HAS BEEN ERECTED AND MAINTAINED SOLELY BY THE OTTAWA JAYCEES A PRIVATE ORGANIZATION WITHOUT THE USE OF PUBLIC FUNDS." The district court and the majority state that the sign cannot be read from the street, but they fail to set forth or cite anything in the record as a basis for this finding. The photograph was apparently taken from the sidewalk, and the sign is clearly legible even in the photograph.
 
 
 366
 The majority relies on Allegheny for the proposition that since the sign was posted by the Jaycees rather than the City, the City is endorsing the activity of the Jaycees. The majority's proposition is an invalid application of Justice Blackmun's statement in Allegheny that a sign accompanying a display in a limited public forum in the seat of government merely tells whose message is being endorsed. In a quintessential public forum, the ownership of the sign is irrelevant; the content of the message alone is significant, and furthermore, there is no presumption of government endorsement of messages in a public forum, as the majority implies.
 
 
 367
 13 The majority takes an over-broad approach to what it views as the required governmental neutrality toward religion: "The Establishment Clause means that government may not prefer one religion over another, nor may it aid all religions evenhandedly." Maj.Op. at 756. While the majority's approach may have some support in the Supreme Court, I doubt that it is likely to prevail. In Chief Justice Rehnquist's dissent in Wallace v. Jaffree, 472 U.S. 38, 106, 105 S.Ct. 2479, 2515, 86 L.Ed.2d 29 (1985) (Rehnquist, J., dissenting) Justice Rehnquist stated: "The Establishment Clause did not require government neutrality between religion and irreligion nor did it prohibit the Federal Government from providing nondiscriminatory aid to religion." Likewise, in Justice Kennedy's recent Allegheny dissent, joined by Chief Justice Rehnquist, Justice White, and Justice Scalia, Justice Kennedy stated, "[r]ather than requiring government to avoid any action that acknowledges or aids religion, the Establishment Clause permits government some latitude in recognizing and accommodating the central role religion plays in our society." Allegheny, 109 S.Ct. at 3135 (Kennedy, J., dissenting). Moreover, Justice O'Connor, joined by Chief Justice Rehnquist, Justice White and Justice Blackmun, in Mergens stated "that although incidental benefits accrued to religious groups who used university facilities [in Widmar ], this result did not amount to an establishment of religion." Mergens, 110 S.Ct. at 2371. Thus, I am unconvinced that any incremental benefits that may accrue from some type of governmental assistance is prohibited under the Establishment Clause.
 
 
 368
 14 The majority states that under my analysis, "assertedly private speech is exempt from Establishment Clause analysis." Maj.Op. at 759. This is a misstatement of my argument, however, for my critique of the majority's application of the Lemon test turns not on the assertion of private expression, but on a finding of private expression in an open public forum removed from the center of government. Contrary to the majority's assertion that "[i]t is precisely through the application of the Lemon and endorsement tests that a reviewing court makes a determination whether expression is private or whether it bears the imprint of government endorsement," the Lemon test is immaterial to a determination of whether speech is private or public.
 
 
 369
 15 See Section 3 infra for a discussion of how the majority's holding requires entanglement with religion.
 
 
 370
 16 The majority also states that "[o]nly the Jaycees' claimed 'equal access' earned them the explicit endorsement and input of the City in designing the concrete-filled holes and metal sleeves especially to support the paintings." Maj.Op. at 760-761. There is no evidence in the record implying that the City designed or helped design the sleeves in the replacement supports. The record states only that the City engineer approved the location of the concrete-filled holes. The mayor testified that this type of action on the part of the engineer was necessary in order to avoid damaging underground electrical or water lines. In the absence of evidence to the contrary, the appropriate inference to be drawn from the City engineer's advice is that he would provide similar advice to anyone else who wished to install any object below the ground. See discussion of diggers' hotline supra at 797-798.
 
 
 371
 17 The majority states that "the City has attempted to neutralize the religious content of the paintings, engaging in what one member of this Court has described as constitutional 'interior-decorating,' American Jewish Congress v. City of Chicago, 827 F.2d 120, 129 (7th Cir.1987)." Maj.Op. at 767. The majority fails to note that the comment regarding "interior-decorating" is in a Judge Easterbrook dissent in which he strongly condemns evaluating the context of a religious display on the basis that such an analysis "requir[es] scrutiny more commonly associated with interior-decorators than with the judiciary." American Jewish Congress v. City of Chicago, 827 F.2d at 129 (Easterbrook, J., dissenting). Thus, Judge Easterbrook's comment hardly supports describing the City's addition of the Festival of Lights as "interior-decorating."
 
 
 372
 18 The majority assumes, without analysis, that the religious message of a display must be neutralized in order to have a secular purpose.
 
 
 373
 "[N]either Lynch nor Allegheny, however, requires that the context of [even] a government exhibit or action neutralize its religious character. Indeed, the Lynch majority specifically denied that it viewed the creche as having only secular meaning:
 
 
 374
 'Justice Brennan states that "by focusing on the holiday 'context' in which the nativity scene appears," the Court "seeks to explain away the clear religious import of the creche"' ... and that it has equated the creche with a Santa's house or reindeer.... Of course this is not true.' "
 
 
 375
 Doe v. Village of Crestwood, 917 F.2d at 1484 (quoting Lynch, 465 U.S. at 684 n. 12, 104 S.Ct. 1365 n. 12) (Coffey, J., dissenting). In Lynch, the Court found a secular purpose in the City's action of displaying a religious symbol even though the creche retained its religious significance. Allegheny did not add a requirement that the religious content of a display be neutralized, and the majority neglected to argue that such a requisite exists. The majority states that "where a city's display of an undeniably religious symbol has been upheld, see Allegheny, 492 U.S. at 573, 109 S.Ct. at 3086; Lynch, 465 U.S. at 688, 104 S.Ct. at 1355; Mather, 864 F.2d at 1291; McCreary, 739 F.2d at 716; Clawson, 915 F.2d at 244, the analysis turns on the extent to which the religious message is either 'neutralized' by the presence of other secular symbols or messages, or is part of an overall, integrated holiday display." Maj.Op. at 762. Once again, the majority makes no effort to support this bald conclusory statement, nor could it. It is clearly constitutional for a religious display in a public forum to retain its religious significance. See Allegheny, 109 S.Ct. at 3122 (O'Connor, J., concurring) (Menorah retains its religious significance), at 3139 (Kennedy, J., joined by Chief Justice Rehnquist, Justice White and Justice Scalia) (Lynch court "did not view a secular aspect of the display as somehow subduing the religious message conveyed by the creche....").
 
 
 376
 19 The majority, unaccountably, relies on a case where a City permanently erected a cross on a government building and tried to justify it as a "promotion of tourism" to support its argument, since "a government may not 'employ religious means to reach a secular goal unless secular means are wholly unavailing.' " Maj.Op. at 763 (quoting American Civil Liberties Union v. Rabun County Chamber of Commerce, 698 F.2d 1098, 1111 (11th Cir.1983)). I would think that even in the majority's eagerness to affirm the district court, it would in all fairness distinguish a private Christmas display in a quintessential public forum from a cross permanently erected on a public building by the government. Moreover, in light of Allegheny and Lynch, there can be no doubt that a city may permissibly use and allow the use of religious symbols in Christmas displays. Thus the secular purpose expressed in the resolution would be an adequate secular purpose even if the City were displaying the paintings.
 
 
 377
 20 Even if I were to agree, which I do not, that the City's resolution was an impermissible endorsement of religion, the proper judicial response would be to enjoin further resolutions, not the Jaycees' private speech. Because there is no legal basis, it is most inappropriate, as the majority decision mandates, to punish a private party for an alleged governmental violation of the Constitution.
 
 
 378
 21 The last sentence of this quotation appears to be the single acknowledgment from the majority that it is the City who must have a secular purpose.
 
 
 379
 22 In the context of the "festival of lights" in the 1988 Christmas decorations of Washington Park, there is no reason to suppose that viewers would have perceived the paintings as a governmental endorsement of religion. As in Lynch, the variety of decorations in the Park provided a number of focal points of which the paints were merely one. The lights, candles, bows, artificial snowflakes and the fifteen foot snowman as a whole dwarfed the paintings. The Jaycees' night photographs of Washington Park (Jaycees' exhibit Q, Q-2, R and S) clearly demonstrate that the paintings are merely one part of the overall Christmas display in Washington Park. Thus, even if the City were sponsoring the display, it would pass constitutional muster, since under Lynch and Allegheny, religious symbols that are part of a governmental display are clearly constitutional when surrounded by other secular symbols of the season.
 
 
 380
 23 For a discussion of the "content" argument, see section 3, infra, Government Entanglement with Religion.
 
 
 381
 24 See, e.g., Deposition of City Council Member William C. Ferguson, supra at 792-793.
 
 
 382
 25 The majority finds the duration of the display indicative of governmental endorsement. If that were so, which I do not believe, the proper remedy would be the one Doe requested--reasonable time, place and manner restrictions on the use of the Park.
 
 
 383
 26 I find it strange that the government may not interfere with the display of morally offensive paintings, absent a finding that they are legally "obscene," see Contemporary Arts Center v. Ney, 735 F.Supp. 743, 744 (S.D.Ohio 1990), but the majority thinks the government must interfere with the display of religious paintings.
 
 
 384
 27 Will we next be requested to censor religious art in government funded art galleries if there is too much of it?